Donald Ray **WOODS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 3–88–132–CR.

Court of Appeals of Texas, Austin.

Dec. 19, 1990.

Rehearing Overruled Jan. 23, 1991.

Gerald M. Brown, Carroll, Brown & Hibbs, Temple, for appellant.

Arthur C. Eads, Dist. Atty., James T. Russell, Administrative Asst., Belton, for appellee.

Before POWERS, JONES and ONION *, JJ.

ONION, Justice.

Appellant was convicted for conspiracy with the intent to commit the offense of aggravated delivery of cocaine of over 400 grams. *See* Tex.Pen.Code Ann. § 15.02 (Vernon 1974) and 1981 Tex.Gen.Law ch. 268, § 3, at 698 [Tex.Rev.Civ.Stat.Ann. art. 4476–15, § 4.03(c) (Texas Controlled Substances Act) since repealed].[1] After the jury's verdict, the trial court assessed punishment at twenty (20) years confinement in the Texas Department of Corrections.[2]

In his first two points of error, appellant contends that the trial court erred in overruling his motion to dismiss the jury array on the basis that appellant was a member of an identifiable racial group, to wit: the black race, and that the State exercised its peremptory challenges to exclude all eight black jurors who could have possibly served on the jury in violation of Tex.Code Cr.P.Ann. art. 35.261 (Vernon 1989), and in violation of appellant's right to equal protection under the Fourteenth Amendment, United States Constitution. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). We agree, and will reverse the judgment of conviction and remand the cause. In the event of a retrial, we will address appellant's third and fourth points of error that the trial court erred in overruling his motions to quash the indictment because the indictment did not allege an offense and if it did, did not adequately put him on notice of the specific conduct upon which the State would rely for conviction. We need not reach the other points of error.

 The State's exercise of peremptory challenges for purely racial reasons violates the Equal Protection Clause of the Constitution. *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In *Batson*, the Supreme Court recognized that a defendant in a criminal case may make a prima facie showing of purposeful racial discrimination in jury selection by relying solely on the facts concerning the jury's selection in his case. In order to establish such a case, the defendant must show the following: (1) that he is a member of a cognizable racial group; (2) that the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the jury panel; and (3) that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the jury on account of their race. In addition, the defendant can rely on the fact that peremptory challenges constitute a jury selection practice that permits those to discriminate who have a mind to discriminate. *Batson*, 106 S.Ct. at 1723; *Keeton v. State*, 724 S.W.2d 58, 65 (Tex.Cr.App.1987) (*Keeton I*).

Once a defendant makes a prima facie showing of purposeful discrimination in selection of the jury panel the burden shifts to the State to come forward with a racially neutral explanation for challenging particular jurors. *Batson*, 106 S.Ct. at 1723. While the prosecutor's explanation need not rise to the level justifying the exercise of a challenge for cause, he must articulate a neutral explanation related to the particular case to be tried. The trial court then will have the duty to determine if the de-

---

* Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex.Gov't Code Ann. § 74.003 (1988).

1. *See* now Tex.Health and Safety Code Ann. § 481.112(c) (Pamp.1990).

2. The Department of Corrections is now the Texas Department of Criminal Justice, Institutional Division. 1989 Tex.Gen.Laws, ch. 785, § 1.19(f), at 3475. *See* Historical Note to Tex. Rev.Civ.Stat.Ann. art. 4413(401) (Supp.1990).

fendant has established purposeful discrimination. *Batson*, 106 S.Ct. at 1723–24. The trial court must examine each of the prosecutor's reasons for striking a black potential juror within the particular circumstances of the case to determine whether a "neutral explanation" for the strike is really a pretext for a racially motivated peremptory challenge. *Keeton v. State*, 749 S.W.2d 861, 868 (Tex.Cr.App.1988) (Keeton II). In making this determination, the trial judge must ascertain whether the prosecutor has articulated a "clear and reasonably specific" explanation of "legitimate reasons" for striking the black venireman. *Batson*, 106 S.Ct. at 1723–1724.

■ Once the State has given its racially neutral explanations, the defendant can offer evidence showing these explanations are merely a sham or pretext. The defendant has the ultimate burden "to persuade the trial judge by a preponderance of the evidence that the allegations of purposeful discrimination are true in fact." *Tompkins v. State*, 774 S.W.2d 195, 202 (Tex.Cr.App. 1987), *aff'd*, 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989). *See also U.S. v. Mathews*, 803 F.2d 325, 330 (7th Cir.1986).

■ In reviewing the trial court's decision, the appellate court must consider the evidence in the light most favorable to the trial court's rulings. We have been told that if the record supports the trial court's findings, the findings will not be disturbed on appeal. *Keeton II*, 749 S.W.2d at 870. The "supported by the record" standard of review has now been replaced, by the "clearly erroneous" standard of review. *Whitsey v. State*, No. 1121–87, Tex.Cr. App., September 19, 1990 (not yet reported) (opinion on State's Motion for Rehearing).[3] While a majority of the Court of Criminal Appeals approved the new standard, there was no unanimity in its application in *Whitsey*, where the judgment of conviction was reversed.

In the instant case, appellant was jointly tried with five hispanic codefendants, mostly Puerto Ricans. Thus, in this non-capital felony case, each defendant was entitled to six peremptory challenges and the State was entitled to six such challenges for each defendant. Tex.Code Cr.P.Ann. art. 35.-15(b) (Vernon 1989). The record reflects that the State utilized all of its thirty-six strikes and the defendants jointly used thirty-six strikes. After the conclusion of the voir dire examination, but before the chosen jury was sworn, appellant timely made his *Batson* art. 35.261 motions.

■ At the hearing appellant called his mother to establish that he was a member

---

**3.** *Whitsey's* plurality opinion, modifying *Keeton* and adopting the new standard, quoted from *Anderson v. Bessemer City*, 470 U.S. 564, 573–574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) as explicating the "clearly erroneous" standard:
> Although the meaning of the phrase "clearly erroneous" is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles, as the Fourth Circuit itself recognized, is that "[a] finding is *'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co.*, 333 U.S. 364, 395 [68 S.Ct. 525, 542, 92 L.Ed. 746] (1948) (emphasis supplied). This standard plainly does not entitle a reviewing court to reverse the finding of the trier of the fact simply because it is convinced that it would have decided the case differently. The reviewing court over-

steps the bounds of its duty under [Fed.R.Civ. Proc.] Rule 52(a) if it undertakes to duplicate the role of the lower court. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo." Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 [89 S.Ct. 1562, 1576, 23 L.Ed.2d 129] (1969). If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 [70 S.Ct. 177, 179, 94 L.Ed. 150] (1949); *see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 [102 S.Ct. 2182, 72 L.Ed.2d 606] (1982).

of the black race—a cognizable racial group. An attorney for a codefendant testified without dispute that there were 100 members of the jury venire, nine of whom were members of the black race. He identified each, and explained that the State had exercised eight of its peremptory strikes to remove blacks from the jury, and that the ninth black venireman, Curtis Stanley Wolf (No. 99), was not reached for possible service on the jury because of his position on the panel. An all-white jury was chosen. Having established a pattern of strikes by which the State excluded all blacks from the jury, the appellant established a strong prima facie case of purposeful discrimination. *Salazar v. State*, 795 S.W.2d 187 (Tex.Cr.App.1990); *Dewberry v. State*, 776 S.W.2d 589 (Tex.Cr.App.1989); *Miller–El v. State*, 748 S.W.2d 459 (Tex.Cr. App.1988); *Hill v. State*, 787 S.W.2d 74 (Tex.App.1990, pet. ref'd); *Allen v. State*, 753 S.W.2d 792 (Tex.App.1988, no pet.); *Cleveland v. State*, 730 S.W.2d 886 (Tex. App.1987, no pet.)

In presenting his case, the appellant asked the court to take into consideration the voir dire examination, the questions asked and responses made. The court agreed. At the conclusion of appellant's presentation, the trial court made no formal ruling as to the prima facie case, but asked the State if it was ready to proceed. The State agreed to proceed without objection. *See Vann v. State*, 788 S.W.2d 899, 902 (Tex.App.1990, pet. ref'd) (where trial court required the State to state its reasons for peremptory challenges of black veniremen); *Adams v. State*, 740 S.W.2d 60, 62 (Tex.App.1987, no pet.) (where State accepted the burden of attempting to produce neutral explanations for striking blacks). *See also Reich–Bacot v. State*, 789 S.W.2d 401 (Tex.App.1990, pet. granted). It is presumed that the trial court found that a prima facie case had been made by the appellant.

After he was sworn, the prosecutor testified that he was unaware he had struck all eight black veniremen until the *Batson* motions were made. He volunteered that he had tried over two hundred criminal jury cases as a prosecutor, principally in Bell and Bexar counties. On cross-examination, he explained that in the majority of these cases "we didn't have a lot of black veniremen because San Antonio seems to have a fairly small black community or at least a fairly small black voting community." In Belton, he further explained, there seemed to be a higher percentage of black veniremen, and that in the approximately 25 cases he tried in Bell County there were black jurors on "maybe 20 per cent of the cases."

The prosecutor then made his explanations for striking each of the black veniremen. After the direct and cross-examination of the prosecutor, the trial court overruled the Batson/art. 35.261 motions, expressly finding that the appellant had not met his burden of persuasion. We shall examine the record to determine the correctness of that ruling.

The prosecutor gave his "neutral explanation" for striking venireman Raymond Jenkins (no. 76), a black corrections officer for the Texas Department of Corrections, as follows:

Mr. Jenkins had a type of haircut, I really don't know how to describe it. I guess I would describe it as a punk rock haircut and the type of haircut that I normally associate with liberalism, radicalism and the drug culture. For that reason and *that reason alone we struck Mr. Jenkins.* (Emphasis supplied.)

A prosecutor's explanation based on a group bias where the prosecutor does not show that the group trait applies to the challenged venireman specifically may be evidence that the prosecutor's stated reason for striking the juror is a sham or pretext. *Keeton II*, 749 S.W.2d at 868. No questions were addressed to Jenkins about his haircut, and the prosecutor made no effort to verify his assumption on voir dire. The only questions asked by the prosecutor established that Jenkins was a corrections

officer at the Coffield Unit, and that in view of his position in law enforcement, he would judge a police officer's testimony the same as any other witness. No examination, or only a perfunctory examination of the challenged venireman by the State weighs heavily against the legitimacy of a facially race-neutral explanation and may illustrate sham or pretext. *Keeton II*, 749 S.W.2d at 869; *C.E.J. v. State*, 788 S.W.2d 849, 857 (Tex.App.1990, writ den.) (a juvenile-civil case). Further, evidence of disparate treatment of a juror, such as when the State does not strike persons with the same or similar characteristics as the challenged venireman, weighs heavily against the legitimacy of a racially neutral explanation given by the State. *Keeton II*, 749 S.W.2d at 868; *C.E.J.*, 788 S.W.2d at 856. On cross-examination of the prosecutor it was established that he did not strike a non-black venireman (No. 49) who wore a loud shirt and had an unusual haircut, squared off and longish in the back. The prosecutor stated he had not seen the 2-inch spike down the back of the venireman's (No. 49) neck, which he would associate with the drug culture, but he "did like the fact that his stepfather was a retired Texas Ranger Captain." The prosecutor's facially legitimate reason is more likely a pretext for discrimination when he has not evenly applied his "peremptory policy" to black and white persons alike. *See Garrett v. Morris*, 815 F.2d 509, 514 (8th Cir. 1987). Under the circumstances, the explanation by the prosecutor was not a plausible race-neutral explanation.

The prosecutor struck venireman Lonnie Allen, Jr. (no. 91), a fifty-year-old black warehouseman for the United States government. The prosecutor stated that Allen "did not appear very interested," and "when something funny was said" during voir dire examination, he did not seem to react as other veniremen. The prosecutor complained that during the one question asked of Allen (whether he could be fair), he (the prosecutor) had no eye contact with the venireman. "I just didn't feel like I established any rapport or line of communi-

cation with the man *and for that reason* I struck him." (Emphasis supplied.).

■ A prospective juror's inattentiveness may be a sufficiently race-neutral reason to justify the use of a peremptory challenge, at least on its face. *Daniels v. State*, 768 S.W.2d 314, 317 (Tex.App.1988, pet. ref'd); *Chambers v. State*, 724 S.W.2d 440, 442 (Tex.App.1987, pet. ref'd). A party is entitled to jurors who will pay attention to the trial. When a venireman's inattentiveness to the proceedings is unmistakable, no problem is usually presented. The difficulty is that in the ordinary case, inattentiveness cannot be so easily or objectively determined. Mere perfunctory examination of the challenged venireman is a factor held to weigh heavily against the legitimacy of a purportedly race-neutral explanation. *Daniels*, 768 S.W.2d at 318; *Slappy v. State*, 503 So.2d 350 (Fla.Dist.Ct. of App. 1987). Desultory voir dire and the State's use of peremptory challenges to strike all or most black veniremen are illustrative types of evidence that can be used to raise the inference of discrimination. *Ex parte Branch*, 526 So.2d 609 (Ala.1987); *Daniels*, 768 S.W.2d at 318.

> "Although we are unwilling to say that a juror's demeanor cannot ever be a racially neutral motive for a prosecutor's peremptory challenge, the protection of the constitutional guarantees that *Batson* recognizes requires the court to scrutinize such elusive, intangible, and easily contrived explanations with a healthy skepticism. Otherwise, 'inattentiveness' will inevitably serve as a convenient talisman transforming *Batson's* protection against racial discrimination in jury selection into an illusion and the *Batson* hearing into an empty ceremony."

*Daniels*, 768 S.W.2d at 317.

In the instant case, there was an abbreviated interrogation consisting of a single question, which laid no factual predicate for the challenge. In the absence of a direct effort by the prosecutor to engage the attention of a venireman with individu-

al and meaningful questions, it is natural to suspect that neither the prosecutor's nor the trial judge's attention was sufficiently focused on the venireman to permit a fair assessment of his attentiveness. C_E_J_, 788 S.W.2d at 857; *Daniels*, 768 S.W.2d at 317.

Lack of eye contact has been said to be a facially race-neutral reason for exercising a peremptory challenge. *See Anderson v. State*, 758 S.W.2d 676, 680 (Tex.App.1988, pet. ref'd); *Townsend v. State*, 730 S.W.2d 24, 26 (Tex.App.1987, no pet.). *See also U.S. v. Cartlidge*, 808 F.2d 1064, 1071 (5th Cir.1987). This explanation, like the explanation of inattentiveness, is of the type least susceptible to objective evaluation and, therefore, most ripe for abuse and subterfuge. *Branch v. State*, 774 S.W.2d 781, 782 (Tex.App.1989, pet. ref'd)

"While not every strike based on such explanation can be summarily disbelieved, it merits closer scrutiny under the criteria suggested in Keeton II. [*Keeton*, 749 S.W.2d at 868–869]" C_E_J_, 788 S.W.2d at 857–858. Here, as to Allen, lack of eye contact based on the asking of a single question is coupled with the general claim of lack of attentiveness, which latter assessment is not objectively verifiable under this record. Under the facts, the prosecutor's explanation is not a plausible racially neutral reason to support the exclusion of Allen. *See C_E_J_*, 788 S.W.2d at 857–858. Moreover, and most importantly, the prosecutor expressly stated that Allen was struck because of the prosecutor's own inability to establish "any rapport or line of communication" with Allen, apparently during the one question individual interrogation. This explanation is akin to the failure to "relate well" to the prosecutor, an explanation which *Rice v. State*, 746 S.W.2d 356 (Tex.App.1988, pet. ref'd) found to "fall afoul" of *Batson*.

Allen Bullock, Jr. (no. 18) was a fifty-year-old black civil service worker at Fort

Hood. He had a son who was a corrections officer. The prosecutor asked him four questions, establishing that he had previously served as a juror in a civil case in Belton involving fraud, and that he would have no problem serving in the instant case. The prosecutor explained his strike on the basis that Bullock "seemed to be unwilling to make eye contact with me when he answered those [four] questions.... [T]his indicated to me that either he was being less than truthful or we just weren't communicating well or he had a problem with me." [4] For many of the same reasons discussed in connection with venireman Allen, we conclude that this explanation was not a plausible, race-neutral explanation under the circumstances presented.

The prosecution also struck Lois Davis (no. 81), a thirty-three year old black teacher. The individualized voir dire examination of Davis reflects:

[Prosecutor]: Mrs. Davis, you've served on a criminal jury case?

A Panelist (Davis?): Apparently I marked the wrong square. It was a civil case. It was a traffic accident.

[Prosecutor]: How long ago was that?

A Panelist (Davis?): Approximately three and-a-half years ago.

[Prosecutor]: And you teach what grades and subjects?

A Panelist (Davis?): I teach ninth grade English and 9 through 12 Speech.

[Prosecutor]: If you're selected to serve, could you be completely fair and objective and give every one a fair trial?

A Panelist (Davis?): I sure will.

[Prosecutor]: Pardon?

A Panelist (Davis?): Yes.

The prosecutor stated he did not like teachers on juries because "I think they are assertive." He then claimed Davis "was very assertive." The cold record re-

---

**4.** Although the prosecutor initially expressed concern about the way Bullock had filled out his jury information card, on cross-examination he stated that "wasn't the reason we struck him."

flects no such assertiveness. In making his explanation, the prosecutor pointed to no intonation of voice, body language, or other non-verbal clues to support his claim that Davis was assertive. No questions were asked Davis to lay a factual basis for the prosecutor's claim. The record does not support the fact that Davis suffered from the group trait the prosecutor claimed he disliked in teachers, nor was the issue shown to be trial-related. The prosecutor expressed concern that Davis, as a speech teacher, would judge the case on the speaking abilities of the attorneys rather than on the evidence. No voir dire questions were addressed to this concern. There was no showing that the feared group trait of speech teachers had application to Davis. A prosecutor's explanation based on group bias, where the prosecutor does not show that the group trait applies to the challenged venireman specifically, may be evidence that the prosecutor's reason for striking the juror is a sham or pretext. *Keeton II,* 749 S.W.2d at 868. "For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror." *Id.,* quoting *Ex parte Branch,* 526 So.2d 609, *supra.* In addition, the prosecutor admitted that he had not struck non-black veniremen numbers 30, 23, 7, 9, 46 and 55, all of whom were teachers or school administrators. Here, the combined reasons, under the facts, do not rise to the level of a plausible race-neutral explanation.

Jewelry White (no. 26), a black housewife, was struck by the prosecutor because she seemed "offended" when she was asked if she had ever worked outside the home. The prosecutor admitted that White did not say she was offended by the question, and that he did not ask, but it was a "perception" on his part from the reply she made ("I chose not to do so") and the manner of the reply. He did not want a juror whom he had offended. The record of the brief voir dire examination reflects:

[Prosecutor]: Mrs. White, have you ever worked outside the home?

A Panelist (White?): Well, I (inaudible).

[Prosecutor]: Never had any jury service before?

A Panelist (White?): No.

[Prosecutor]: Do you have any problem about this being the first time?

A Panelist (White?): No.

[Prosecutor]: If selected to serve you can give everybody a fair trial?

A Panelist (White?): Yes, sir, I think so.

The cold record of the voir dire does not objectively verify the prosecutor's reason for striking the venireman. Antagonism or hostility by the venireman to the prosecutor may be a facially race-neutral explanation. *See U.S. v. Forbes,* 816 F.2d 1006, 1010–11 (5th Cir.1987); *Levy v. State,* 749 S.W.2d 176, 178 (Tex.App.1988, pet. ref'd). And a prosecutor's purely subjective explanation may, under certain circumstances, be based on the non-verbal behavior of the venireman without reference to any particular issue or objective criteria. *Branch v. State,* 774 S.W.2d at 784. Here, the prosecutor gained the impression that White was offended by the reply and the manner of the reply to the question asked. While the prosecutor did not further clarify the matter, the appellant, on cross-examination by the prosecutor, did not seek further clarification as to "manner of the reply," etc. The question is a close one, but viewing the evidence in its entirety, we cannot say that the trial court's ruling as to White was clearly erroneous.

We also conclude that the prosecutor offered plausible race-neutral explanations for the peremptory challenges of black veniremen Johnnie Mae James (no. 48), Kay Wiggins Brown (no. 59), and Colita Lynn Flemming (no. 29). James was overheard by the prosecutor in the elevator commenting about "not wanting to be here." Later during voir dire examination, James was seen "dozing off," and she was struck, as were all who were observed dozing. *See*

*U.S. v. Ratcliff*, 806 F.2d 1253 (5th Cir. 1986), *cert. denied*, 481 U.S. 1004, 107 S.Ct. 1625, 95 L.Ed.2d 199 (1987); *Ivatury v. State*, 792 S.W.2d 845 (Tex.App.1990, pet. pending). Brown was struck because of her "bad record during prior jury service." *Branch*, 774 S.W.2d at 783. Flemming was struck because of her youth, because she was impressionable, and appeared to be fearful of the proceedings, the defendants, and their counsel. This was verified in part by an attorney for a codefendant who testified in support of the establishment of a prima facie case for purposeful discrimination. Counsel testified that he considered Flemming to be a "total follower," and he would have struck her except for his cooperation with other defense counsel.

"Whether the government has rebutted an inference of intentional discrimination depends not upon the independent 'acceptability' of the proferred explanations, but rather upon the totality of relevant circumstances, including the strength of the evidence which raised the inference, the credibility of the prosecutor, and the nature of the explanations viewed in their *entirety*. If a prosecutor strikes all the blacks from the jury or otherwise conducts himself on voir dire so as to raise a strong inference of intentional racial discrimination, it should not be sufficient to merely explain each peremptory strike in terms generally, and liberally, found 'acceptable' by the courts, such as 'he was inattentive'; 'she was hostile'; or 'two others didn't look me in the eye.' Rather, it is the sum quality of all the reasons that is relevant to the ultimate result. Furthermore, a trial court should not disregard the evidence on which it based its initial finding that the defendant established a prima facie case." Serr and Maney, *Racism, Peremptory Challenges and The Democratic Jury: The Jurisprudence Of A Delicate Balance*, Journal of Criminal Law and Criminology, Vol. 79, p. 1, 60–61 (1988) (Emphasis in original.).

■ In the instant case the appellant established a strong prima facie case of purposeful discrimination. The State used its peremptory challenges to exclude all blacks possibly eligible to serve on the jury, and the appellant was entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate. In the State's effort to rebut the prima facie case, the prosecutor denied that he considered race in exercising his strikes, and stated that he was unaware he had eliminated all black veniremen until the *Batson* motions were urged. A prosecutor cannot overcome the inference of discrimination "merely by denying that he had a discriminatory motive or 'affirming his good faith in making individual selections.'" *Batson*, 106 S.Ct. at 1723. The prosecutor had tried approximately 200 criminal jury trials in which few black jurors served. Without further clarification than was given, such evidence tended to strengthen the inference of purposeful discrimination rather than rebut the prima facie case. In rebuttal, the prosecutor offered his explanation for the strikes made. The explanations include lack of eye contact, inattentiveness, haircut, assertiveness, and speculation about whether a venireman would "grade" the attorneys upon their speaking abilities, etc. The sum quality of all the reasons is relevant to the ultimate result taken in consideration with the prima facie case.

Further, the improper exclusion of even one member of the defendant's race from the jury for racial reasons invalidates the entire jury selection process and requires reversal. *See Batson*, 106 S.Ct. at 1725; *Keeton II*, 749 S.W.2d at 871, n. 1 (Teague, J. concurring); *Henry v. State*, 729 S.W.2d 732, 734 (Tex.Cr.App.1987); *Keeton I*, 724 S.W.2d at 65, n. 5. This proposition was reaffirmed only recently in the opinion on rehearing in *Whitsey* (slip. op. 14) by the Court of Criminal Appeals in which the "clearly erroneous" standard of review in *Batson* type cases was adopted. As earlier noted, we have found that at least four of the black veniremen were improperly excluded. In light of the record as a whole,

we conclude that the trial court's ruling that the appellant did not meet his burden of persuasion was "clearly erroneous" under the new standard of review. *See* and *cf. Gamble v. State,* 257 Ga. 325, 357 S.E.2d 792 (1987). We are aware that great deference should be accorded the trial court's findings, and that the trial court is the trier of the facts and the evaluator of the credibility in a *Batson* hearing. However, whether under the current standard of review or under other standards such as "supported by the record," abuse of discretion or great deference, we are of the opinion the same conclusion would be reached given the facts of the instant case. Appellant's first and second points of error are sustained.

■ We shall consider the third and fourth points of error in reverse order in view of the nature of the contentions. In point of error number four, appellant contends the trial court erred in overruling his motion to quash the indictment "on the basis that it does not allege an offense under the Penal Code for the reason that the object offense is an offense outside the Penal Code."

The indictment alleged that appellant Woods and a number of named codefendants and coconspirators did, with intent to commit the felony offense of aggravated delivery of cocaine over 400 grams, agree to engage in conduct that would constitute such offense, and in furtherance of such agreement performed some 22 alleged overt acts.

The offense of criminal conspiracy is found in Title 4 of the Penal Code. *See* Tex.Penal Code Ann. § 15.02 (Vernon 1974). The object offense of aggravated delivery of cocaine was contained, at the time of the commission of the offense and at trial, in Tex.Rev.Civ.Stat.Ann. art. 4476–

15, § 4.03(c) (Texas Controlled Substances Act) (now repealed).[5] Appellant argues that the two statutes could not be legally utilized in tandem because the provisions of Title 4 of the Penal Code (including § 15.02) do not apply to offenses defined by laws outside the Code. He notes that § 4.03(c) of the Controlled Substance Act defined an offense not found in the Penal Code. Appellant relies upon Tex.Pen.Code Ann. § 1.03(b) (Vernon 1974), which provides that Titles 1, 2 and 3 apply to offenses defined by other laws unless the statute defining the offense provides otherwise. Since Title 4 offenses are not included within § 1.03(b) appellant urges that criminal conspiracy cannot be applied to violations of the Controlled Substance Act as it existed at that time. This, of course, was the holding of the *Baker* -line of cases. *See Dubry v. State,* 582 S.W.2d 841, 844 (Tex.Cr.App.1979); *Ex parte Russell,* 561 S.W.2d 844 (Tex.Cr.App.1978); *Ex parte Lopez,* 549 S.W.2d 401 (Tex.Cr.App.1977); *Baker v. State,* 547 S.W.2d 627, 629 (Tex. Cr.App.1977); *Moore v. State,* 545 S.W.2d 140 (Tex.Cr.App.1976). *See also Nichols v. State,* 653 S.W.2d 768, 773–774 (Tex.Cr. App.1981) (opinion on rehearing).

In 1981, § 4.011 was added to the Controlled Substances Act,[6] and it was amended in 1983.[7] The 1983 version that was in effect at the time of the instant offense.[8] Section 4.011 (Preparatory Offenses) provided:

> The provisions of Title 4, Penal Code, apply to Section 4.052 *and offenses designated as aggravated offenses under Subchapter 4 of this Act,* except that the punishment prescribed for the offense that was the object of the preparatory offense. (Emphasis supplied.)

It is appellant's position that § 4.011 did not change the result in *Baker* because the Penal Code itself was never amended to

---

5. See now Texas Health and Safety Code Ann. § 481.112(c) (Pamp.1990).

6. 1981 Tex.Gen.Laws, ch. 268, at 696 (eff. Sept. 1, 1981).

7. 1983 Tex.Gen.Laws, ch. 425, at 2361, 2371 (effective August 29, 1983).

8. See now Tex.Health and Safety Code Ann. § 481.108 (Vernon Pamp.1990).

provide that Title 4 of the Code applies to offenses defined by other laws. We do not agree.

Texas Gov't Code Ann. § 311.025(a) (Vernon 1988) provides:

(a) Except as provided by Section 311.-031(d), if statutes enacted at the same or different sessions of the legislature are irreconcilable, the statute latest in date of enactment prevails.

Texas Gov't Code Ann. § 311.031(d) (Vernon 1988) provides:

(d) If any provision of a code conflicts with a statute *enacted by the same legislature* that enacted the code, the statute controls. (Emphasis supplied.)

*See also* Tex.Pen.Code Ann. § 1.05(b) (Construction of Code) (Vernon Supp.1990).

Section 1.03 of the Penal Code was enacted in 1973 (1973 Tex.Gen.Laws, ch. 399, § 1, 883, at 886, effective January 1, 1974) and § 4.011 was added in 1981 to the Controlled Substances Act and amended in 1983 (1983 Tex.Gen.Laws, ch. 425, § 4 at 2371, effective August 29, 1983).

We conclude that § 311.025(b) of the Government Code governs the proper interpretation to be applied if there is an irreconcilability. The exception contained therein has no application here. Section 4.011 being the latest expression of the legislative will at the time controls, despite the absence of a like amendment to the Penal Code. Appellant cites no authority in support of his contention.

Texas Const. Ann. art. III, § 1 (1984) delegates to the Legislature law-making authority, including the right to define crimes and fix penalties. *McNew v. State*, 608 S.W.2d 166, 176 (Tex.Cr.App.1980) (opinion on rehearing). In the exercise of its law-making authority, the Legislature is not constitutionally or otherwise required to place all penal provisions in a single penal code, although that might be highly desirable. In enacting § 1.03(b) of the Penal Code, the Legislature recognized its right to regulate the applicability of Penal Code provisions to "offenses defined by other laws." *See* and *cf. Honeycutt v. State,* 627 S.W.2d 417, 423–424 (Tex.Cr. App.1981) (opinion on rehearing).

"The purpose of interpreting a statute is to arrive at and give effect to the intention of the lawmaking power, to be found, if possible in the enactment itself, and controlling when plainly manifest." Tex. Jur.3d, Vol. 18, Criminal Law, § 13, at 52–53 (1982). Section 4.001 by its very terms permitted the applicability of Title 4 of the Penal Code to the Controlled Substances Act, but limited its applicability to certain designated offenses. The enactment in § 4.001 was in direct response to *Baker.* The legislative intent is clear and is controlling when so plainly manifest as here. Appellant's fourth point of error is overruled.

In point of error number three, appellant advances the contention that the trial court erred in overruling the motion to quash the indictment "on the basis that it does not adequately put appellant on notice of the specific conduct by him upon which the State would rely for conviction." Appellant relies upon his federal and state constitutional rights to notice of the accusation against him, as well as pertinent statutory provisions. *See* Sixth Amendment, United States Constitution, Art. I, § 10, Texas Constitution and Tex.Code Cr.P.Ann. arts. 21.02(7), 21.03, 21.04, 21.11 and 21.12 (Vernon 1989). In appellant's motion to quash, he relies particularly upon the fact that overt acts numbers 15 and 18 in the indictment do not allege to whom he delivered the cocaine.

The indictment alleged that appellant Woods and a number of codefendants and coconspirators

on or about the 6th day of October, 1986 and on other dates subsequent thereto, and before the presentment of this indictment in said County and State, did then and there, with the intent to commit the offense of aggravated delivery of cocaine over 400 grams, agree that they would engage in conduct that would constitute

said offense, to wit: to intentionally and knowingly deliver a controlled substance, namely, cocaine, in the amount of more than 400 grams including any adulterants and dilutants, if any, and in pursuance and furtherance of such agreement one or more of said defendants and coconspirators, to wit:

(Thereafter 22 overt acts were alleged, including

15. On or about December 12, 1987, Donald Ray Woods sold and delivered a quantity of cocaine in Bell County, Texas;

18. On or about December 30, 1987, Dennis Colon, Dana LaMay and Donald Ray Woods sold and delivered a quantity of cocaine in Bell County, Texas;....)

Appellant argues he was not put on notice of the specific conduct upon which the State would rely, and that he should have been informed to whom he was alleged to have delivered or sold cocaine. Appellant generally claims the same was crucial to his defense.

■■■ The elements of the offense of criminal conspiracy under Tex.Pen.Code Ann. § 15.02 (Vernon 1974) are: (1) a person; (2) with intent to commit a felony; (3) agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and (4) he or one or more of them performs an overt act in pursuance of the agreement. *Williams v. State*, 646 S.W.2d 221, 222 (Tex.Cr.App.1983). *See also* Tex.Jur.3d Vol. 18, Criminal Law § 105, p. 162 (1982).

... The express overt act requirement is new to Texas law.... The overt act element is included to require proof beyond the bare agreement that a socially dangerous combination exists.

Searcy and Patterson, Practice Commentary to Tex.Pen.Code Ann. § 15.02 (1974).

Although the 'overt act' required to be committed by this section might be sufficient to constitute the 'act' under Section 15.01 in criminal attempt, it does not necessarily have to be so since the concept of criminal conspiracy reaches further back into preparatory conduct constituting inchoate offenses than does criminal attempt. Additionally, criminal conspiracy is defined to reach group conduct and facilitates prosecution by providing extraordinary evidentiary and procedural advantages.

The mens rea requirement is satisfied with 'intent that a felony be committed.' Explanatory Commentary, Texas Anno. Penal Statutes, Branch's 3rd Ed. Vol. 1, § 15.02, p. 637 (Bancroft–Whitney 1974).

In *Farrington v. State*, 489 S.W.2d 607, 609 (Tex.Cr.App.1973), the court wrote:

The conspiracy to commit a crime and the commission of the substantive crime which is the object of the conspiracy are separate and distinct offenses.... An indictment charging a conspiracy to commit a felony need not allege the offense intended with the particularity necessary in an indictment charging the commission of the intended offense.

In *McCann v. State*, 606 S.W.2d 897, 898 (Tex.Cr.App.1980), the court held that the commission of the substantive offense is not an essential element of the conspiracy charged. Further, the overt act committed in furtherance of a conspiracy need not be a criminal act in itself. *Id.* at 898. *See* and *cf. Cosper v. State*, 657 S.W.2d 166 (Tex. App.1983, no pet.). In addition, all elements of a completed offense need not be proven in a conspiracy case. *McCann*, 606 S.W.2d at 898; *Brown v. State*, 576 S.W.2d 36, 42 (Tex.Cr.App.1979); *Skidmore v. State*, 530 S.W.2d 316 (Tex.Cr.App.1975).

■■■ Usually, an indictment which tracks the language of the statute is legally sufficient, and the State need not allege facts which are merely evidentiary in nature. *Bynum v. State*, 767 S.W.2d 769, 778 (Tex.Cr.App.1989); *Daniels v. State*, 754 S.W.2d 214 (Tex.Cr.App.1988).

The instant indictment sufficiently tracked the statute. Twenty-two overt acts

were alleged to have been undertaken in furtherance of the conspiracy. Specificity regarding the details of the overt acts is not required. The allegations in overt acts nos. 15 and 18, of which appellant particularly complains, gave the nature of the act, the place, and the date. In fact, appellant was given sufficient notice by the allegations in all twenty-two overt acts.

■ A motion to quash should be granted only where the language concerning the defendant's conduct is so vague or indefinite as to deny the defendant effective notice of the acts he allegedly committed. *DeVaughn v. State*, 749 S.W.2d 62, 67 (Tex.Cr.App.1988).

In *Adams v. State*, 707 S.W.2d 900, 903 (Tex.Cr.App.1986), it was stated:

> The important question is whether a defendant had notice adequate to prepare his defense. The first step in answering this question is to decide whether the charging instrument failed to convey some requisite item of "notice." If sufficient notice is given, this ends our inquiry. If not, the next step is to decide whether, in the context of the case, this had an impact on the defendant's ability to prepare a defense and, finally, how great an impact.

*See also Geter v. State*, 779 S.W.2d 403, 407 (Tex.Cr.App.1989).

■ Sufficient notice having been given by the instant indictment, we conclude that should end the inquiry. If it could be argued otherwise, it is observed that appellant makes only a global assertion that his defense was impacted. He does not point out what defense to any of the overt acts he would have had if "notice" had been given. His particular complaints relate to the failure to reveal the identity of the individual to whom deliveries of cocaine were made in the alleged overt acts nos. 15 and 18. The testimony shows the deliveries were made to a Frank Cortez. In view of our disposition of this appeal and in the event of a retrial on this indictment, appellant will have notice of the person to whom deliveries were made. In viewing the whole record, the trial court did not err in overruling the motion to quash. Appellant's third point of error is overruled.

In view of our disposition of this cause, we need not reach the other points of error.

The judgment is reversed and the cause is remanded to the trial court.