Rodney CHILDRESS, Appellant,

v.

The STATE of Texas, Appellee.

No. 07–89–0366–CR.

Court of Appeals of Texas,
Amarillo.

March 26, 1991.

426

Hurley & Sowder, William C. Sowder, Lubbock, for appellant.

Travis Ware, Dist. Atty., Michael West, Lubbock, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

A jury found appellant Rodney Childress guilty of engaging in organized criminal activity and fixed his punishment at 45 years confinement in the Texas Department of Corrections (now, the Texas Department of Criminal Justice, Institutional Division). By three points of error, appellant contends that the trial court erred in overruling his motions (1) to transfer venue and (2) to quash the indictment, and that (3) the evidence is insufficient to sustain his conviction. We will affirm.

Appellant's initial point is grounded on the theory that pretrial publicity denied him the due process right of a fair trial. Our standard of review is whether the trial court abused its discretion in refusing to grant the change of venue. *DeBlanc v. State,* 799 S.W.2d 701, 705 (Tex.Cr.App. 1990).

Before trial, appellant moved for a change of venue, alleging the existence of "so great a prejudice against [him] that he cannot receive a trial by an impartial jury free from outside influences, and there is a reasonable likelihood that a fair trial cannot be obtained in this cause in Lubbock County, Texas." The motion was supported by the affidavits of two compurgators. The State filed controverting affidavits. *See* Tex.Code Crim.Proc. arts. 31.03, 31.04 (Vernon 1989).

At the venue hearing, the defense called ten witnesses, four of whom were representatives of the media, and the State called seven. Mike Brown, L.E. Anderson, Dale Wells, Lorenzo Sedeno and Eddie Richardson testified to a common belief that the bad reputation Damon Richardson, characterized by the media as a "kingpin drug dealer and in this gangland or slaying type thing," had in the community would result in a bias against anyone connected to him. They opined that potential jurors could not resist being influenced by the fact that appellant is both the half-brother and a co-defendant of Damon Richardson, making it difficult or impossible for appellant to receive a fair trial in Lubbock County.

Brown testified that the people of Lubbock County had already decided appellant's guilt, and related inquiries concerning appellant's case within the previous six weeks which demonstrated the general public's awareness of appellant's connections with Richardson. Anderson recounted his experience as juror in the trial of another co-defendant of Damon Richardson, and stated his belief that the jury's awareness of the connection with Richardson resulted in the assessment of a harsher punishment than would otherwise have been imposed.

In addition, Wells, Sedeno, and Eddie Richardson testified to the large amount of media coverage of the cases involving Damon Richardson and his co-defendants. They stated that the coverage was more highly publicized than any criminal case ever seen in Lubbock County, that it "had grabbed more headlines than some of our politicians," and that people never really stopped talking about the crimes.

Admitted into evidence were 104 transcript pages of clippings of articles published in the three daily editions of the Lubbock Avalanche Journal, a daily newspaper with a combined daily circulation of 68,425 and a Sunday circulation in excess of 72,-508, which concerned the present case or those of co-defendants. Although the clippings contained numerous references to appellant, identifying him as a suspect or co-defendant in a triple homicide and in an organized crime conspiracy, he figured prominently in no more than seven of the articles.

Representatives from the three local television stations submitted video tapes, which had been retained on file, containing "clippings" of the news coverage by the respective stations of the Richardson case and the associated cases. None of the submitted tapes was comprehensive; each witness testified that much material had not been preserved. The tapes contained 91

segments, about 17 of which concerned appellant. The last story concerning any of the associated cases aired two days prior to the hearing and concerned an appellate ruling on a trial judge's action in dismissing co-defendant Michael Stearnes' counsel.

Lastly, Marta Rosas, prosecuting attorney for the State, agreed that it could be prejudicial to the appellant's trial to show that co-defendant Damon Richardson was convicted of capital murder. She added, however, that she did not want the jury to know that Richardson had been convicted of capital murder.

The State presented Don McBeath, Debbie Porr, Jeff Wilson, and T.L. Wagner, who testified that they had either heard no talk concerning appellant and the cases of his co-defendants, or that talk had died down in the last several months. Each of them and another witness, Jack Bryant, held the opinion that appellant could receive a fair and impartial trial in Lubbock County. Testimony was adduced that other cases had received as much or more publicity than the Richardson and connected cases. Porr, Wilson and Wagner stated they were not familiar with appellant's name and had not heard talk in the community about him. All of them disclaimed knowledge of any dangerous combination against appellant by influential persons in the county, and appellant offered no evidence to the contrary.

■ At the venue hearing, appellant bore the heavy burden of affirmatively proving his ground for change of venue, the existence in the community of such prejudice that the likelihood of obtaining a fair and impartial trial is doubtful. *Beets v. State*, 767 S.W.2d 711, 743 (Tex.Cr.App. 1987), *cert. denied*, 492 U.S. 912, 109 S.Ct. 3272, 106 L.Ed.2d 579, *reh'g denied*, 492 U.S. 938, 110 S.Ct. 26, 106 L.Ed.2d 637 (1989). Absent such a showing, the trial court cannot be said to have abused its discretion by acting without reference to any guiding rules and principles, *i.e.*, by acting arbitrarily and unreasonably, *Montgomery v. State*, No. 1090–88, slip op. at 10–11 (Tex.Cr.App., May 30, 1990); *Down-*

*er v. Aquamarine Operations, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986), and its denial of a change in venue will not be disturbed on appeal. *Ransom v. State*, 789 S.W.2d 572, 579 (Tex.Cr.App.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3255, 111 L.Ed.2d 765 (1990).

■ Many factors are to be considered by the court in ascertaining whether outside influences affect the community climate of opinion as to a defendant. Included are: (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of governmental officials with the release of publicity, (3) the length of time between dissemination of publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) factors likely to affect the candor and veracity of the prospective jurors on voir dire. *Henley v. State*, 576 S.W.2d 66, 71–72 (Tex. Cr.App.1978).

■ Admittedly, the associated crimes achieved notoriety and were the subject of considerable pretrial publicity; however, the pretrial publicity concerning appellant was not shown to be pervasive, prejudicial or inflammatory. *Ransom v. State*, 789 S.W.2d at 579. Of the 104 transcript pages of clippings from the Lubbock Avalanche Journal, appellant figured prominently in only seven of the articles, the last appearing more than a year before the trial date. Likewise, in the three video tapes of 91 segments of television news coverage, testimony indicated that appellant was the subject of about 17 segments. This publicity was available to Lubbock County's 210,000 people and its 108,332 qualified voters, but the evidence adduced was conflicting whether the community took notice of the publicity and whether there was any resulting prejudice against appellant.

The news coverage of the Richardson capital murder trial did include several interviews with the defense attorneys and

the prosecuting attorneys. However, none of these interviews concerned appellant or mentioned him. Additionally, there is no showing of improper or inflammatory remarks by prosecuting attorneys and no demonstration of how appellant was harmed.

In brief, the evidence presented at the hearing created for the trial court's resolution a factual dispute whether appellant could receive a fair trial in Lubbock County. The court found, upon adequate evidential support in the record, that appellant could receive a fair trial. Consequently, we hold that the court did not abuse its discretion when it overruled appellant's motion to change venue. *DeBlanc v. State*, 799 S.W.2d at 705.

Our holding is not altered by appellant's assertion that although several jurors affirmed they could set aside the publicity and outside influences, they could not. There was no showing of anything likely to affect the candor and veracity of prospective jurors on voir dire. Out of the entire jury panel, only two were excused for inability to set aside pretrial publicity. In addition, three other members of the jury panel were excused, two for prejudice against drug users and one because of an inability to consider the entire range of punishment. There remained 35 members on the panel, from which each side could strike 10 to select a jury.

Still, appellant argues that he was forced to trial with at least three jurors he should have been allowed to strike, presumably for prejudice. The jurors were Simon, Rickman, and Scott.

The record reveals that none of them had heard of appellant previously and that each had heard of co-defendant Damon Richardson only through news accounts. None demonstrated more than superficial knowledge of Richardson's case, and the only knowledge Simon or Rickman had of appellant's organized crime case was from news accounts of a wiretap and drug bust. Scott testified she had not seen or heard any news accounts of the drug bust. Of the other members of the panel who served on the jury, only Bell and Davis had previous-ly heard of appellant. Otherwise, no evidence was presented of other events which would affect the attitude of the individual jurors.

■ This showing, even considered with the evidential disputes whether appellant was identified with Damon Richardson in the community or whether he would be prejudiced by the identification, is an insufficient showing of disqualifying prejudice. It is insufficient because appellant has not shown, as it must be shown for a change of venue, that the publicity about his case gave rise to an "actual, identifiable prejudice attributable to pretrial publicity on the part of the community from which will come the members of the jury." *Ransom v. State*, 789 S.W.2d at 578–79. Moreover, jurors do not have to be totally ignorant of the facts and issues of a particular case and, therefore, the mere fact that it has received publicity in the media does not constitute a showing of prejudice such that a defendant is entitled to a venue change. *DeBlanc v. State*, 799 S.W.2d at 704.

■ Nevertheless, appellant continues with a claim of apparent harm by offering the facts that the jury deliberated, he says, for less than 45 minutes, did not ask to review the evidence, and sentenced appellant, a young first-time offender, to 45 years confinement. However, the amount of time and absence of any request to review the evidence may as readily, if not more reasonably, reflect the strength of the State's evidence in the absence of any conflicting evidence adduced by the defendant, as it would the prejudice of the jurors. Additionally, we note that appellant did not present to the jury any evidence that he was a first-time offender, but expressly waived such presentation.

Thus, nothing in the subsequent voir dire of the jury panel or in the trial that ensued is a sufficient basis for overturning the court's venue ruling. It follows that the trial court did not abuse its discretion when it denied appellant's motion for a change of venue. *DeBlanc v. State*, 799 S.W.2d at 705. The first point of error is overruled.

■ By his second point, appellant charges the trial court erred in overruling his motion to quash the indictment for failure to give sufficient notice of the acts alleged, thereby preventing him from preparing an adequate defense. In this regard, a quashal should be granted only when the language concerning the defendant's conduct is so vague or indefinite as to deny him effective notice of the acts he allegedly committed. *DeVaughn v. State*, 749 S.W.2d 62, 67 (Tex.Cr.App.1988). Then, to survive a timely motion to quash, the indictment on its face must contain allegations of the facts necessary to show that the offense was committed, to bar subsequent prosecution for the same offense, and to give the defendant notice of precisely what he is charged with. *Id.* at 67.

■ Upon review, we must first determine if the notice given is sufficient. If it is, our inquiry is ended; if not, the record must be examined to determine the impact of the deficiency upon appellant's defense and its extent. *Adams v. State*, 707 S.W.2d 900, 903 (Tex.Cr.App.1986). The indictment contained allegations that appellant and a number of co-defendants

> on or about the 14th day of April, 1988, and continuing through and including the 3rd day of May, 1988, in Lubbock County and State of Texas, did then and there, with the intent to establish, maintain, and participate in a combination, conspire to commit the offense of unlawful delivery of a controlled substance listed in penalty group one, to-wit: Cocaine, and did then and there agree among themselves, and with each other, to engage in conduct constituting said offense, namely, to intentionally and knowingly deliver, by actual transfer, to a person or persons unknown to the Grand Jurors, a controlled substance listed in penalty group one, to-wit: Cocaine, less than twenty-eight (28) grams.

Thereafter, overt acts performed in pursuance of the agreement were alleged, in pertinent part, as follows:

> (1) On April 16, 1988, at the direction of DAMON JEROME RICHARDSON, RODNEY CHILDRESS, LORETTA JEAN WARD, EDWARD SWANSON AND LARRY DONNELL ALEXANDER, inventoried the supply of controlled substance and the United States currency;
>
> (2) On April 24, 1988, at the direction of DAMON JEROME RICHARDSON, RODNEY CHILDRESS, EDWARD FITZGERALD SWANSON, AND LARRY DONNELL ALEXANDER transported United States currency from the Seven Acres Motel to 818 Dover, Lubbock, Texas;
>
> (3) On April 29, 1988, at the direction of DAMON JEROME RICHARDSON, LARRY DONNELL ALEXANDER, CHARLES JUNIOR PATTERSON, L.D. RICHARDSON, AND ANGELO NAPOLEON ANSLEY traveled to First Federal Savings Bank in Lubbock, Texas, to exchange the small denomination United States currency for one hundred dollar bills;
>
> \*   \*   \*   \*   \*   \*
>
> (5) On May 3, 1988, CHARLES JUNIOR PATTERSON, ANGELO NAPOLEON ANSLEY, ROBERT RAY YOUNG, ALNADA GAIL JOHNSON, and CATHLEEN TAYLOR arrived at the Lubbock International Airport with ANGELO NAPOLEON ANSLEY in possession of more than four hundred (400) grams of a controlled substance, listed in penalty group one, to-wit: Cocaine.

Appellant voices three objections to the indictment.

First, he points to the wording and punctuation of subparagraphs (1), (2), and (3), claiming that an ambiguity is produced by the fact that the introductory prepositional phrases and the names in the list that follows such phrases are each set off by commas. As a result, he contends, it is impossible to know who was doing the directing and who was actually performing the actions of inventorying, transporting, traveling, and exchanging. Therefore, he concludes, he was not given adequate notice of what he did as an overt act.

However, a plain reading of these subparagraphs makes it clear that in each,

Damon Jerome Richardson is the director and all the others named in succession are performing the additional acts alleged. Consequently, appellant was given specific notice, by subparagraphs (1) and (2), of his overt acts of inventorying the supply of controlled substance and United States currency, and of transporting United States currency.

The specific notice obtains even though there is one instance of mispunctuation in subparagraph (1), where a comma placed after the last name in a series separates it from the verb following. Yet, it has long been recognized that "incorrect grammer [sic], bad spelling, bad handwriting, the use of words not technically in their correct sense or places, will none of them make an indictment bad unless same causes the thing intended to be charged to lack sense or certainty." *Westbrook v. State,* 88 Tex. Cr.R. 466, 227 S.W. 1104, 1105 (1921). This obvious defect of form did not alter the clear and unambiguous meaning of the sentence so as to prejudice the substantial rights of appellant and render the indictment insufficient. Tex.Code Crim.Proc. Ann. art. 21.19 (Vernon 1989).

■ Second, appellant argues that the trial court should have granted his motion to quash because subparagraph (1) is insufficient in that it states he inventoried "the supply of controlled substance" without specifying the type or amount of such substance. By this contention, appellant would require the State to produce the result of an inventory in order to properly allege such inventory as an overt act. Yet, the focus of the overt act alleged in subparagraph (1) is not that it, in itself, creates the criminal liability of appellant. The law is clear that an overt act in pursuance of criminal conspiracy need not be criminal. *McCann v. State,* 606 S.W.2d 897, 898 (Tex.Cr.App.1980).

■ The acts of the inventorying of supplies, the accounting of proceeds, and the safekeeping of such proceeds, are germane to show that the agreement among the members of the combination existed and was an operative agreement that had gone beyond the meeting of the minds.

*Kennard v. State,* 649 S.W.2d 752, 767 (Tex.App.—Fort Worth 1983, pet. ref'd). Hence, the type and amounts of drugs inventoried are as incidental to the conspiracy charge as the amount of currency accounted for, and are not essential to the preparation of a defense. Because the particulars of the inventory are evidentiary in nature, specificity in the indictment was not required, *Livingston v. State,* 739 S.W.2d 311, 321 (Tex.Cr.App.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988), and the indictment was sufficient without listing the type and amount of the controlled substance.

■ Appellant also advances the corollary argument that the indictment references to "cocaine, less than 28 grams" in the body of count II, to "the supply of controlled substance" in subparagraph (1), and to "more than 400 grams of cocaine" in subparagraph (5), make it impossible to know whether the controlled substance is the same in each of the three references or different. To the contrary, the charging paragraph and the allegations of overt acts gave notice of the different dates and the nature of the acts performed on those dates, thereby imparting sufficient notice. *Woods v. State,* 801 S.W.2d 932, 944 (Tex. App.—Austin 1990 pet'n filed).

In sum, the indictment tracked the language of the appropriate subsections of section 71.02, Texas Penal Code Annotated (Vernon Supp.1991), thereby adequately charging appellant with the offense of organized criminal conspiracy. *Clayton v. State,* 652 S.W.2d 950, 956 (Tex.Cr.App. 1983), *cert. denied,* 464 U.S. 1046, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984). Thus, the trial court did not err in refusing to quash the indictment. Appellant's second point of error is overruled.

To prove the allegations in the indictment, the State partially relied on evidence obtained in an extensive wiretap investigation. By his last point of error, appellant contends "there is a total void of credible evidence" to support his conviction of engaging in organized criminal activity. He argues (1) there was no evidence or insufficient evidence that he was the person

speaking on the taped conversations or that the conversations related to controlled substances and, consequently, there was no evidence that he either directed an inventory or inventoried a supply of controlled substances and United States currency; (2) the taped conversations admitted into evidence are inaudible without the aid of the transcriptions prepared by the State, and the jury was exposed to the transcript of a portion of a taped conversation not entered into evidence; and (3) there was no or insufficient evidence that appellant formed the agreement with at least four of his co-conspirators, that he agreed to engage in the substantive offense, and that he acted with intent and scienter.

Upon review for sufficiency, the evidence must be considered in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Cr.App. 1988). "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction ... [is] whether the record evidence could reasonably support a finding of guilty beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. at 318, 99 S.Ct. at 2788.

■ The investigation giving rise to this prosecution involved a wiretap of a telephone and surveillance. The wiretap was on a telephone, number 744–4729, at the Seven Acres Motor Lodge, also referred to as the Seven Acres Motel, in Lubbock. This telephone was an intercom telephone, and several persons could participate in conversation with the calling party at the same time. This circumstance frequently required the caller to name the person to whom he was addressing his remarks. A surveillance camera also monitored comings and goings at the site, and surveillance teams in unmarked vehicles followed targeted parties to identify them and determine their destination.

On the tape of calls numbered 888, 4397, and 6914, the caller addressed a person by the name of "Rodney" and a recognizable male voice consistently answered to that name. Appellant correctly points out the State failed to produce an in-court identification of the voice responding to the name "Rodney" on the taped conversations as being his. The only identification of the recorded voices was by monitors who testified that, in time, they were able to recognize the voices on the tapes and identify them because of earlier instances in the recordings when each voice had responded after being addressed by name. There was testimony by some monitors identifying the recorded voice as that of "the defendant." However, they made clear that the basis for their identification was that outlined above, and no monitor testified that he had ever heard appellant speak and recognized his voice as being the same as the voice which answered to the name "Rodney" in the recorded conversations.

In spite of the absence of direct evidence of identity, the record contains an abundance of circumstantial evidence from which a rational jury could conclude beyond a reasonable doubt that appellant was the speaker. Testimony from members of the surveillance teams reveals that on two occasions, April 17 and April 24, 1988, appellant was seen leaving the motel with Larry (Tue, pronounced "Two") Alexander and Edward Swanson. On the April 17th occasion, Eileen Miller was driving. On both these occasions, their destination was 818 Dover, the residence of appellant and Odessa Williams. Eileen, Edward, and Tue are names which appeared in the taped conversations with great frequency, and recognizable voices replied when the caller addressed them by these names.

A comparison of two calls with corresponding surveillance brings the evidence into sharper focus. On April 24, 1988 at about 4:30 p.m., call 4397 was placed from the County jail to the Seven Acres Motel. Some of those participating in this call answered to the names Tue, Rodney, Loretta, Edward, Randy and Napoleon. The call concerned the transport of $13,166. The caller instructed Rodney to hold the money and Tue to hold the key [to the bag of

money]. They were to take the money "[y]ou know where you all goin'." At 5:00 p.m., a white Datsun was observed departing from the Seven Acres Motel containing appellant, Edward Swanson, Larry (Tue) Alexander, and a fourth, unidentified male. They drove to the 818 Dover address and entered the house there.

Lastly, on April 29, 1988, phone call 6446 was recorded in which the speakers included those answering to the names Tue, Chubby, Napoleon and Loretta. Tue, Chubby, and Napoleon were instructed to travel together to the bank in Chubby's car, a Camaro, and "get some hundreds." That day, at 2:40 p.m., Charles (Chubby) Patterson was observed driving a brown and tan Camaro from the Seven Acres Motel in which Angelo Napoleon Ansley, L.D. Richardson, and Larry (Tue) Alexander were passengers. They went to the First Federal Savings Bank in Lubbock, where Tue remained in the car and the other three entered the bank to exchange some money for $100 bills. A bank employee identified Ansley and Patterson, said there was a third man with them, and described the transaction. After exchanging money for $100 bills, they left the bank at about 3:20 p.m. and went to the house at 818 Dover. Later, all of the men got back in the car, made two stops, and returned to the Seven Acres Motel.

Appellant was closely associated with and connected to people whose names match those of the people addressed in the taped telephone conversations and who participated in activities directly associated with those taped conversations; appellant himself participated in an activity discussed only moments before in a taped conversation in which a party answering to his name conversed; and he resided at 818 Dover where other activity discussed in the taped conversations centered. This circumstantial evidence, when considered in the light most favorable to the verdict, was sufficient for a jury to find beyond a reasonable doubt that it was appellant's voice which answered to the name Rodney on the taped telephone conversations.

Appellant contends the State did not produce any proof that the subject of the conversation was controlled substances. The State produced a tape recording of ingoing call 888, placed about 12:25 p.m. on April 16, 1988. In that call, appellant was heard repeatedly counting the existing amounts of "R's," "longs," "shorts," "pinks," etc., and informing the caller of those amounts. He also counted the amounts of money presented by several people and relayed those results. Appellant was also heard to assert that he was obeying instructions to observe while others present recounted the substances and money to verify his results.

The participants used common terms for controlled substances such as, "oz," "pinks," and "R's." Expert testimony was presented that these terms commonly denote an ounce of cocaine, phenmetrazine, known by the brand name preludin, and rock cocaine, respectively. The speakers also made reference to "longs," "shorts," and "apples," terms expert testimony defined respectively as a gram, a half-gram, and an ounce of cocaine. The jury, as exclusive judge of the credibility of the witnesses, could accept this testimony, which, incidently, was unchallenged and uncontradicted. *Johnson v. State*, 503 S.W.2d 788, 793 (Tex.Cr.App.1974). Viewed in the light most favorable to the prosecution, this was sufficient evidence to enable a trier of fact to find that appellant inventoried a supply of controlled substance and United States currency.

Appellant contends the tape recording of the telephone conversations was inaudible and could not be understood by the jury without the aid of the transcriptions prepared by the State. Acceding to appellant's request, we reviewed the tapes first without reference to the record transcript. We note that only the transcripts to calls 888 and 1254 were admitted into evidence and that neither the jury nor we had the benefit of any transcription with respect to the seven remaining phone calls. While small portions of the tapes, notably calls 1364 and 1372, were difficult to understand on a single hearing, the vast majority of the tapes were of very good quality and

were easily understood at first hearing without reference to any transcript in spite of the background noise contained therein.

Appellant argues that he was harmed when the jury was allowed to read some of the transcript "showing prejudicial language concerning Appellant and others" which was not heard on the tape. The argument refers to the jury's exposure to pages 9 through 14 of the transcript of call 888 which was before the jury momentarily while personnel were changing tapes in the tape player. The portion of the conversation on these pages was not admitted into evidence.

We have reviewed this section of the transcript. It deals mainly with coordination of efforts to get the water turned off at "the building in the flats," an incidental drug transaction, and the caller's attempts to get one of the participants, Loretta, to stay in the room by the phone and attend to the business at hand, all intermingled with efforts to continue the inventory. The only language which would have been uniquely prejudicial, when compared with the portions of the conversation introduced into evidence, was the reference on the last page by the caller to the fact that people stealing drugs from the caller will "feel sorry later."

Appellant does not explain how he was harmed by the jury's viewing of these pages, if, indeed, they had enough time to read more than a sentence or two. At trial, counsel objected that the "very intelligent jury" was probably reading a page or two ahead, but this is not a showing that they read five pages ahead to where the possibly prejudicial language appeared. The trial court promptly recalled the transcript and instructed the jury that they were to "disregard any that [they had] read that was not played." No further transcriptions were given to the jury or admitted in the record.

Even if the caller's remark were taken as a veiled reference to an act of violence, there is no objection in the record concerning possible admission of an extraneous offense. Tex.R.App.P. 52(a). In any event, we note that the caller was speaking to Ralph and Tue, not to appellant, and the remark was neither addressed to appellant nor referred to him in any way. Because appellant was too far removed from this remark to have been connected to it, and the court promptly issued its corrective instruction, any error envisioned by the jury's improbable reading of the remark was harmless beyond a reasonable doubt. Tex.R.App.P. 81(b)(2).

In considering appellant's attacks on the State's proof of agreement, intent, and scienter, we will group them together. Citing *Abbett v. State*, 694 S.W.2d 534 (Tex.App.—Corpus Christi 1984, pet'n granted), appellant argues that the language in the indictment "and did then and there agree among themselves and with each other, to engage in conduct constituting said offense [delivery of cocaine]," required the State to assume more than the statutory burden of proving that appellant "agree[d] with one or more persons." *See* Tex.Penal Code Ann. § 71.01(b) (Vernon Supp.1991). By the language, he contends, the State was required to prove that he made an agreement with at least four others of the combination, *Abbett v. State*, 694 S.W.2d at 542, to engage in conduct constituting delivery of cocaine. Assuming, *arguendo*, that *Abbett* correctly states the burden imposed on the State by this indictment, the State met its burden.

The necessary agreement may be inferred from the acts of the parties. Tex. Penal Code Ann. § 71.01(b) (Vernon Supp. 1991). In this instance, the State produced tape recorded conversations and surveillance reports demonstrating the existence of a tightly organized group of people working in close cooperation and intimate association with each other to conduct ongoing operations to sell controlled substances of several types. This evidenced an agreement in which each of them performed an integral part and without which none of them would have engaged in the conduct demonstrated.

The tape of call 888, a recording of the inventory count, alone sufficiently demonstrates the agreement of appellant with at least four other co-conspirators named in

the indictment, Angelo Napoleon Ansley, Loretta Ward, Edward Fitzgerald Swanson, and Larry Donnell Alexander, and they with appellant, for it shows each of them working in close association with the others to conduct the inventory and accounting and to package and store the proceeds. Call 4397 and the accompanying surveillance shows appellant acting in concert with four co-indictees to transport proceeds to the 818 Dover address. Later calls numbered 6446, 6899 and 6914, together with surveillance reports, reveal the indictees working together in various combinations to prepare funds for transport, to transport the funds, and to replenish the stock of cocaine.

Appellant contends that without a charge to the jury on the law of parties, the State was required to prove that he, himself, agreed to engage in the delivery of cocaine. He notes the State failed to produce physical evidence of drugs or paraphernalia in his room at 818 Dover, or fingerprints or proximity to connect him with the drugs discovered in the search of the Seven Acres Motel or in the arrests at the Lubbock Airport. He then argues that he was not sufficiently connected with the drugs to prove that he, himself, ever agreed to engage in the delivery of cocaine.

In an organized crime conspiracy, the agreement to engage in the delivery of cocaine encompasses agreement that one or more of the members of the combination engage in that conduct. Tex.Penal Code § 71.01(b) (Vernon Supp.1991). The concept of criminal conspiracy reaches preparatory and group conduct constituting inchoate offenses, thereby providing extraordinary evidentiary and procedural advantages which facilitate prosecution. *Woods v. State*, 801 S.W.2d at 943. There is no need for a charge on the law of parties to establish criminal liability, for such liability is based on the act of agreement, the illegal purpose of the agreement, and an overt act by the accused and one or more of the other members of the combination. Tex.Penal Code Ann. § 71.02(a) (Vernon Supp.1991); *Barber v. State*, 764 S.W.2d 232, 235 (Tex.Cr.App.1988).

This particular indictment did not require the State to shoulder a heavier burden than imposed by statute and prove that each of the co-conspirators agreed to perform the substantive offense or to collectively perform the same overt act. Rather, it simply required a showing of agreement that *one or more* of them would perform the substantive offense and that two others, one of them appellant, performed an act or acts in furtherance of this agreement. The overt act alleged need not be the same as the substantive underlying felony, and need not be criminal in itself. *Barber v. State*, 764 S.W.2d at 235; *McCann v. State*, 606 S.W.2d at 898.

The scienter element of this offense is that appellant know of the criminal activity of the combination. *Lucario v. State*, 677 S.W.2d 693, 698 (Tex.App.— Houston [1st Dist.] 1984, no pet'n). The State has demonstrated by call 888 that appellant helped maintain the combination by actively inventorying controlled substances, counting the proceeds from the sale of such substances, and attesting to the accuracy and honesty of others involved in such inventory activities; by call 4397 and associated surveillance that appellant transported proceeds to his residence for safekeeping; and by call 6914 that appellant assembled with co-conspirators, bringing bags for the upcoming trip to California, and agreed to ride to the Lubbock Airport to verify that members of the group departed Lubbock for California with the money for the purchase of a new supply of cocaine. In addition, appellant was identified as having accompanied his aunt, Odessa Williams, to a safety deposit box, later found to contain a large amount of currency. Lastly, the search of the 818 Dover address and the Seven Acres Motel revealed a floor safe, locking bank bags, drugs, drug paraphernalia, currency, safe deposit box keys, and currency in those safe deposit boxes.

Intent is determined from the appellant's words, acts and conduct. *Jenke v. State*, 487 S.W.2d 347, 348 (Tex.Cr.App. 1972). Viewed in the light most favorable to the prosecution, this evidence was suffi-

cient to allow a rational jury to conclude beyond a reasonable doubt that appellant performed these acts with the intent to establish, maintain, or participate in a combination and in agreement with the indicted co-conspirators that one or more of them would engage in delivery of cocaine, in an amount less than twenty-eight grams, and did perform overt acts in pursuance of such agreement. *Barber v. State*, 764 S.W.2d at 237. Appellant's third point of error is overruled.

The judgment of the trial court is affirmed.