John SHEARS, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–93–00040–CR.

Court of Appeals of Texas,
Tyler.

Feb. 28, 1995.

Kenneth Nash, Tyler, for appellant.

Edward J. Marty, Tyler, for appellee.

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

HOLCOMB, Justice.

A jury convicted Appellant of the crime of engaging in organized criminal activity by conspiring to commit the offense of unlawful delivery of a controlled substance and sentenced him to 62 years in prison. In his first point, Appellant challenges the sufficiency of the evidence to support his conviction. In his remaining points, Appellant contends that the court erred when it: (1) failed to quash the jury panel after the State used its strikes in a discriminatory manner; (2) improperly admitted an audio tape into evidence; and, (3) failed to grant a mistrial after the prosecutor made prejudicial statements to the jury during the State's closing argument. We will affirm.

Tyler police suspected that Appellant and other co-defendants were actively selling crack cocaine from an apartment located at 1316 West First Street. As a result, several police officers began a three day covert surveillance operation in a house across the street. Officer David Spencer and Officer Reginald Conley used a video camcorder with a night-scope to tape over 10 hours of the activities that were occurring less than one hundred feet away. On the video, numerous individuals were shown swarming the yard and driveway at 1316 West First Street. These individuals approached cars and pedestrians as they lingered briefly near the apartment. During the three days, many of the same people systematically delivered an object that was exchanged for money. It is undisputed that some of these exchanges involved the sale of drugs. Undercover officers Charles Bledsoe, Carlos Samples, and Danny Alexander wore "body-mikes" and made "buys" of crack cocaine from various sellers. Alexander and Samples made two buys of crack cocaine from Appellant. All of the sellers operated out of the same apartment on West First Street and the same cars repeatedly drove through the area.

On May 23, 1993, the Tyler Police Department raided the apartment. During the search, officers seized a razor blade, a straight-shooter, a plastic bag containing a white powder residue, a medicine bottle containing five (5) rocks of cocaine, and other paraphernalia. Appellant and twenty-three (23) other individuals were later indicted for delivery of a controlled substance, as well as for participating in an organized criminal activity. The court tried Appellant along with Gregory Mumphrey, Darrell Lacy and Charles Bell.

In his first point of error, Appellant challenges the sufficiency of the evidence to support his conviction. He argues that the State offered no evidence, direct or circumstantial, to show that he and other co-defendants agreed to work within a combination to sell crack cocaine. Appellant claims that the drug activities at 1316 West First Street were too loosely knit to comprise a combination and that the dealers of cocaine were competing with each other rather than working together within a conspiracy.

■ In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781,

61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Cr.App.1989). After reviewing all of the evidence, we will resolve all conflicts and reasonable inferences in favor of the verdict. *See Thomas v. State,* 753 S.W.2d 688, 695 (Tex.Cr.App.1988). This standard places full responsibility on the trier of fact to weigh the evidence, to resolve conflicts in the testimony, and to draw reasonable inferences from basic to ultimate facts. *See Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. If there is evidence to establish the defendant's guilt beyond a reasonable doubt, and the jury believes the evidence, the appellate court cannot reverse the judgment on an evidence point. *See Soto v. State,* 864 S.W.2d 687, 691 (Tex.App.—Houston [14th Dist.] 1993, pet. ref'd).

 To be convicted of engaging in an organized criminal activity, Appellant must have committed, or conspired to commit, an underlying offense with the specific intent to participate in that offense with a number of persons. *See Barber v. State,* 764 S.W.2d 232, 234 (Tex.Cr.App.1988); *see also, Richardson v. State,* 763 S.W.2d 594, 596 (Tex. App.—Corpus Christi 1988, no pet.). By definition, a person "conspires to commit" an offense when he agrees with others to engage in conduct that would constitute an offense and performs some overt act pursuant to their agreement. TEX.PEN.CODE ANN. § 71.01 (Vernon 1994). Evidence of the defendant's conduct, systematic methods of operation, together with evidence of group participation in joint activities, supports a conviction. *United States v. Ochoa,* 609 F.2d 198 (5th Cir.1980); *Kennard v. State,* 649 S.W.2d 752, 764 (Tex.App.—Fort Worth 1983, pet. ref'd). Appellant's intent can be determined from his words, acts, and conduct. *Childress v. State,* 807 S.W.2d 424, 435 (Tex.App.—Amarillo 1992, no pet.). An agreement may be inferred from the acts of the parties. *Id.*

 Because of the nature of the offense of working within a conspiracy, direct evidence is rarely available, and the State must rely on circumstantial evidence to prove the essential elements of the offense. *Nickerson v. State,* 686 S.W.2d 294, 297 (Tex. App.—Houston [14th Dist.] 1985, pet. ref'd).

In a circumstantial evidence case, it is not necessary that every fact point directly and independently to the guilt of the accused. *Hinkle v. State,* 779 S.W.2d 504, 507 (Tex. App.—Beaumont 1989, pet. ref'd).

In this case, nine police officers testified at the trial. During the three day surveillance, each officer had been assigned to a task that was compatible with the officer's specific area of expertise. One officer operated the video tape machine, one officer used binoculars to identify the defendants, three officers bought cocaine from the defendants, and two officers served as "back-ups" to the officers who were making the "buys." Several officers participated in searching the apartment, and one officer analyzed the chemical composition of the substances that were confiscated. Undercover Officer Bledsoe testified that on May 22, 1993, he and Officer Alexander drove up to 1316 West First Street and that Appellant was the first of several sellers who approached their truck. After Bledsoe told Appellant that he wanted to buy some cocaine, Appellant told Bledsoe: "I'll go get it and be right back. I am in the business." Although Appellant went directly into the apartment, he did not return with cocaine for Bledsoe. However, Appellant did sell a rock of cocaine to Alexander minutes later. Undercover Officer Samples testified that later that same evening, Appellant "walked over and placed . . . his right hand into [Samples'] vehicle. [Appellant] showed [Samples] one rock of cocaine. [Samples] gave [Appellant] a—twenty-dollar bill, and [Appellant] turned and walked away" without saying a word. Both of these transactions were recorded on the video tape.

At the State's request, the court admitted into evidence the video tapes that were made by Officers Spencer and Conley during the surveillance. Conley described the drug-related activities at 1316 West First Street as a "large operation" and estimated that "at least one hundred" transactions occurred over the three day period. As many as "15 to 20 people" are seen at one time participating in the sale of an object. Appellant appears on the video tape actively participating with other co-defendants and delivering an object in exchange for money. Appellant systemat-

ically approaches cars, makes an exchange, retreats into the same apartment, and then returns within seconds. Typically, a seller gives an object to a buyer with an outstretched arm and a "cupped hand." In return, buyers give cash to the sellers. On the tape, buyers leave the apartment within 30 seconds after their arrival. Police officers with significant experience in undercover drug-related operations testified that the sequence of events that the jury had observed on the video tapes are consistent with the delivery of crack cocaine. One officer told the jury that it was apparent that the individuals were working within a conspiracy because "there are a multiple of people all operating under the same guidelines for the same purpose."

Two adult co-indictees, Andre Ray and Stephanie Kirkpatrick, were offered immunity by the State in exchange for their testimony. Ray confirmed that Appellant was known to deliver cocaine to customers in exchange for money. Stephanie Kirkpatrick, who describes herself as only a "buyer," testified that she purchased crack cocaine from 1316 West First Street approximately 50 times in May 1993, and that several of the co-indictees either helped her purchase the crack or sold her the crack. Although she recognized Appellant, she had not bought any crack from him.

A juvenile co-indictee, K.W., testified that he normally bought a fifty dollar rock of cocaine, divided it with a razor blade into four sections and sold it for $100. Sometimes one of the co-defendants would sell it for him. K.W. testified that he participated in these drug transactions four or five times at 1316 West First Street during May of 1993. He confirmed that the standard price for a rock of cocaine at that location was $20. He also verified to the jury that the activity in which he was participating on the video tape was the sale of crack cocaine. K.W. stated that his sole purpose for being at 1316 West First Street was to sell "dope," and that Appellant "hustled" and made a "living" doing the same thing. After viewing the evidence in the light most favorable to the verdict, the evidence is ample to support Appellant's conviction. Point one is overruled.

In his second point, Appellant contends that the court erred when it refused to quash the jury panel after the State had exercised its peremptory strikes in a discriminatory manner. Appellant and the other three co-defendants are black. The record shows that there were thirteen African–American members on the venire panel within the strike zone. Seven African–Americans were struck for cause. The State struck four of the six African–Americans that remained on the panel. Two African–Americans served on the jury panel.

Appellant focuses his attention on venire member number 10, Brenda Sessions, a 41 year old black female. Sessions's juror information card indicated that she was married, that her husband worked for Exxon, and that they had two children. However, Sessions failed to complete the portions of the questionnaire regarding her place of employment and her occupation. After concluding that Sessions was unemployed, the prosecutor struck her from the panel, but he did not strike any retired people. The only jurors that served on the panel were either employed or retired.

Appellant contends that the prosecutor used Sessions's failure to complete the jury information card to disguise his effort to strike Sessions because of her race. Appellant argues that the prosecutor's conclusion that Sessions was unemployed rather than a housewife was based on pure speculation. At the *Batson* hearing, the prosecutor conceded that he failed to question Sessions during voir dire about her employment. The prosecutor testified at length about his reasons for exercising all 24 of the State's peremptory strikes. As to his reasons for striking Sessions, he stated:

> We cut her for the simple reason that she didn't list any employment. We cut everybody that was unemployed. The one thing I did like about her—and I kind of wished she had a job—she was dressed real nice and everything, but she didn't list her employment. One other thing I liked about her, she was in a jury before in a cocaine trafficking case, and she said that the Defendant copped a plea before we could do anything, and I wish that she had had a

job, because I'd really like to have kept her. But, as this court is well aware, it's not my policy to put unemployed people on the jury.

. . . . .

I would expect somebody who was a housewife or homemaker to put that in there. The fact that she didn't put anything in there concerns me. That's what got her struck off the jury.

Appellant asked the prosecutor to state the reason that he did not strike other jurors from the panel who had spouses that were unemployed. The prosecutor explained:

I wasn't really looking at what their husbands or wives were doing ... they're not the ones on the jury. If [Session's husband] had been [the person filling out the juror card] indicating that he had worked for Exxon for 19 years, I'd have probably taken him.

Appellant also notes that the prosecutor failed to exclude jurors who did not answer questions regarding their religious preference, their age, the number of children that were in their families, or the length of time that they had resided within the county. When Appellant asked the prosecutor to explain the difference between a person's failure to answer some questions on the card, which apparently bothered the prosecutor, and a person's failure to give answers to other questions, which apparently did not bother the prosecutor, the prosecutor stated:

Well, I wouldn't say that [it doesn't bother me when people fail to answer questions on their juror card]. If you left your card completely blank, as one person did,—that bothers me—It depends on how much you leave blank. And it also depends on what it is that you leave blank. If you're asking what's the most important thing in my mind, the most important thing is whether or not you're working, especially when you have four Defendants from all appearances who are not working.

■ In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court concluded that the State's deliberate denial of jury participation to black persons solely because of their race

violates a defendant's rights under the EQUAL PROTECTION CLAUSE of the UNITED STATES CONSTITUTION. After the court determines that a defendant has made a prima facie *Batson* case, the burden shifts to the prosecutor to come forward with race-neutral reasons for its strikes. *Keeton v. State*, 749 S.W.2d 861, 865 (Tex.Cr.App.1988); *Silva v. State*, 800 S.W.2d 912, 915 (Tex.App.—San Antonio 1990, no pet.). The prosecutor's explanation must present a clear, specific, and legitimate reason for each challenge. *Brooks v. State*, 802 S.W.2d 692, 694 (Tex.Cr.App. 1991); *Miller-El v. State*, 790 S.W.2d 351, 356 (Tex.App.—Dallas 1990, pet. ref'd).

■ In situations such as these, the court's presence is not minimized, and we afford great deference to its findings. *See Robinson v. State*, 851 S.W.2d 216, 226 (Tex. Cr.App.1991). The judge is present to see the panel as they are questioned by the attorneys and the court is able to evaluate · the prosecutor's state of mind, demeanor, and credibility. *Newsome v. State*, 829 S.W.2d 260, 266 (Tex.App.—Dallas 1992, no pet.). By largely judging the credibility of the prosecutor, the content of the explanation and all the other surrounding facts and circumstances, the court must make a finding of fact concerning purposeful discrimination. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723. Conversely, the court cannot merely accept the reasons given by the prosecutor at face value, but must also consider whether the prosecutor contrived the racially neutral explanations to avoid admitting a discriminatory act. Even with the most detailed statement of facts, the record is many times lacking when the court makes such a sensitive judgment call.

■ Should the prosecutor give a race-neutral explanation, the State presents a fact issue that the court can only resolve by assessing the weight and credibility of the evidence. *Tompkins v. State*, 774 S.W.2d 195, 202 (Tex.Cr.App.1987). Appellant bears the ultimate burden to prove, by a preponderance of the evidence, that the prosecutor exercised the State's peremptory strikes in a discriminatory fashion. *Id.* Therefore, we must determine whether sufficient evidence

exists to support the trial judge's finding that the prosecutor did not discriminate against Sessions. If the record supports the court's finding, we will not disturb it unless the court's decision is "clearly erroneous." *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *see Tennard v. State,* 802 S.W.2d 678, 680 (Tex.Cr.App.1990).

■ After hearing Appellant's argument and the prosecutor's explanations, the court concluded that the prosecutor's reason for striking Sessions was race-neutral. The prosecutor admitted that he struck Sessions because he assumed that she was unemployed and that he did not want an unemployed person on the jury panel. Appellant did not put forth any evidence other than Sessions's juror information card. From these facts alone, Appellant concludes that the record supports his argument that the State struck Sessions because of her race. We do not agree. It is not uncommon for a litigator to strike unemployed persons and leave retired persons on the panel. On its face, the prosecutor gave a race-neutral explanation for his challenge of Sessions, and Appellant did not counter the State's explanations with evidence that would lead this Court to believe that the prosecutor's testimony was a pretext in an attempt to discriminate and that the court's ruling was clearly erroneous. *See Salazar v. State,* 795 S.W.2d 187, 190 (Tex.Cr.App.1990). Point two is overruled.

In point three, Appellant contends that the court erred when it allowed the State to publish an audio tape to the jury, which was recorded from the "body-mikes" on officers Bledsoe and Alexander while they made a "buy" from alleged co-conspirators. Appellant argues that the audio tape should not be admitted into evidence because the State failed to prove that the taped statement was made by a co-conspirator, that Appellant was a member of the conspiracy, and that it was made while Appellant was in furtherance of the conspiracy. We hold that the tape was properly admitted into evidence.

■ Under Rule 801(e)(2)(E) of the TEXAS RULES OF CRIMINAL EVIDENCE, a statement is not hearsay if it is "offered against a party and is . . . a statement by a co-conspir-

ator of a party during the course of and in furtherance of a conspiracy." TEX.R.CRIM. EVID. 801(e)(2)(E). The conspiracy includes everything within the contemplation of the conspirators and is terminated only after every act within the plan and breadth of the conspiracy has been performed. *Id.* In *Ward v. State,* the Court of Criminal Appeals held that before the State attempts to admit a statement under the co-conspirator exception to the hearsay rule, it must offer proof to show that the co-conspirator was participating in a conspiracy in which the defendant also participated *or later joined,* and that it must offer proof that the statement was made *during the furtherance of the conspiracy. Ward v. State,* 657 S.W.2d 133, 136–137 (Tex.Cr.App.1983). In attempting to prove the existence of a conspiracy, the State is not limited to offering evidence that is only relevant to the people that have been charged as a co-defendant, nor is it limited to a certain date. *Id.* The evidence may encompass the entire time limit of the conspiracy and may include all parties to the conspiracy. *See Castillo v. State,* 761 S.W.2d 495 (Tex.App.— Waco, 1988), *aff'd,* 810 S.W.2d 180 (Tex.Cr. App.1990). Even though a declaration or act of a co-conspirator may have occurred out of the presence and hearing of a defendant, each declaration or act of a co-conspirator is admissible until the object of the conspiracy is complete. *Callaway v. State,* 818 S.W.2d 816, 826 (Tex.App.—Amarillo 1991, pet. ref'd).

■ In this case, the State offered sufficient evidence to admit the audio tapes under the co-conspirator exception to the hearsay rule. The police officers who were experienced in the area of drug trafficking confirmed that the activities that they observed on the video tapes were consistent with the delivery of a controlled substance within a common scheme. Appellant made two buys directly from undercover police officers. All three witnesses that were offered immunity by the State confirmed that the activities that were shown on the video tapes were drug activities and that Appellant was involved in those activities. Therefore, the trial court properly permitted the jury to hear the statements that the co-conspirators

made on the audio tape that were in furtherance of the conspiracy. Point three is overruled.

In his last four points, Appellant contends that the court erred when it allowed the prosecutor to make improper arguments to the jury at the guilt/innocence phase of the trial. He argues that some of the prosecutor's statements improperly shifted the burden of proof to Appellant and that other statements made by the prosecutor were inherently prejudicial to his case. We do not agree.

■ Proper jury argument is limited to the general areas of: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to arguments of counsel; and (4) pleas for law enforcement. *Todd v. State*, 598 S.W.2d 286, 296–97 (Tex.Cr.App. 1980). An argument that exceeds these bounds is not reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, it violates a mandatory statute, or it injects new facts, harmful to the accused, into the trial proceeding. *Id.*

During his closing statement to the jury in this case, Appellant argued that the police procedure that was used during the surveillance was flawed. He points out that the State provided a video tape that allegedly depicted an intense drug scene, and yet the police officers who testified admitted that they did not arrest everyone, nor could they even identify everyone who appeared on that tape. As a result, Appellant reasoned to the jury that the random arrests gave the police sporadic information and implicated people who may or may not have been involved in drug transactions at 1316 West First Street. Even if some of the defendants were involved in drug trafficking, Appellant concludes that any evidence that was before the jury was too speculative to support a finding that any of the defendants were working within a conspiracy to deliver a controlled substance. According to Appellant, vital information was lacking for the jury to trust the State and infer that the defendants were guilty beyond a reasonable doubt. In response to these arguments, the prosecutor stated:

Now, what else? [The defendants' attorney] gets up here [and] makes a lot of noise about the people, you know, who were driving off, people who could have been stopped and everything else, you know, could have stopped and—"You know that there were searches, Ladies and Gentlemen."

. . . . .

Ladies and Gentlemen, [The defendants' attorney] had the names of those officers. [All of the defendants] do. If there were searches, put them on the stand. Let's talk about it.

. . . . .

I don't want anybody to think that I'm trying to shift the burden to [the defendants]. All I'm telling you is, [the defendants] have the power to call people to the stand just like the State does. [The defendants] have the names of the officers. If they want to put them up there, they can do it. They certainly don't have to. But [the defendants have] that information.

Appellant objected to the prosecutor's argument on the basis that the State placed an improper burden on the defendants. The court sustained the objection, instructed the jury to disregard and denied Appellant's motion for mistrial. On appeal, Appellant argues that the prosecutor's comments effectively locked the Appellant into an undesirable defensive position to meet the jury's expectations that were raised by the prosecutor's comments. We do not agree.

■ The State is entitled to comment on an accused's failure to call or produce competent witnesses when it is relevant to a disputed issue. *Carrillo v. State*, 566 S.W.2d 902, 912 (Tex.Cr.App. [Panel Op.] 1978). Remarks about the subpoena power of a defendant are proper if they refer to the defendant's failure to produce evidence from other sources. *Livingston v. State*, 739 S.W.2d 311, 338 (Tex.Cr.App.1987). This argument may be accompanied by an inference that the absent testimony would have been material and harmful to the defendant's position. *Kerns v. State*, 550 S.W.2d 91, 96 (Tex.Cr. App.1977).

Appellant also argued to the jury that the State did not produce any evidence to show that Appellant and the co-defendants agreed to work within a combination to sell crack cocaine. Appellant claims that the drug activities at 1316 West First Street were too loosely knit to comprise a combination and that the dealers of cocaine were competing with each other rather than working together within a conspiracy.

In response, the prosecutor stated:

How is it possible for all of these people to just show up at 1316 West First Street and just deal drugs independently of one another?

Ladies and Gentlemen, if there was that much competition and if [the defendants] are all a bunch of independent dope dealers, there would be a killing up there every night. Every single time that somebody came up there in competition with this bunch, they would get killed. They would—

Appellant objected that the prosecutor's statement was inappropriate and that it called on the jury to speculate about violence that was not supported by the record. The trial court sustained the objection, instructed the jury to disregard, and denied Appellant's motion for mistrial. Appellant argues that we should reverse Appellant's conviction because the prosecutor injected harmful, inflammatory and prejudicial facts in the State's argument that were not in the record. We do not agree.

 The invited argument rule permits the State to respond to opposing counsel's argument, unless the response exceeds the invitation. *Mora v. State*, 797 S.W.2d 209, 214–15 (Tex.App.—Corpus Christi 1990, pet. ref'd). Even though Appellant couldn't expect the jury to conclude that he did not deliver a controlled substance, he did attempt to convince the jury that he did not deliver cocaine within a conspiracy. Therefore he primarily argues that the people who were delivering cocaine were in competition with each other. As a response to Appellant's defense, the State was entitled to respond.

 Next, Appellant reasons that the following arguments made by the state were reversible error because the prosecutor effectively advised the jury to make a decision contrary to the courts charge. Appellant's first complaint arises after the prosecutor states:

[The defendants' attorney] gets up here and says, 'You know, Crosby Radford is down here, and he's delivering, and [K.W.] says [Crosby Radford's] buying, and [Crosby Radford's] over here directing, so I guess that means there's no organization, because Crosby Radford is doing a bunch of things within the organization.' That doesn't make any sense.

Don't let anybody muddy the waters up on you. I don't have to prove the specific role each of them play. I tried to get that before you, but I don't have to prove the specific role each of them played within the organization itself. I have to prove to you that there is an agreement, a conspiracy, the agreement and overt acts which form the conspiracy, and then I have to prove one overt act on the part of each of these four men.

Now, you see a lot more than one overt act on each of their parts, but it doesn't make one of them more guilty than the other one. If you have one overt act in furtherance of the conspiracy, and someone else has 100 overt acts in furtherance of the conspiracy, they are both equally guilty of engaging in organized crime.

Now, the issue at punishment may be something different—

Appellant objected that the prosecutor was attempting to inject matters regarding punishment of the defendants during the guilt/innocence phase of the trial. Again, the court sustained Appellant's objection, instructed the jury, and denied Appellant's motion for mistrial.

Appellant also raised a similar objection when the prosecutor argued:

Now, [the defendants' attorney] was talking about [the prosecutor] making you infer [guilt]. And the law allows you to infer, so if somehow it's my fault that the law allows you to infer, blame me for that. But he's talking about, the State is going to make you guess—make you guess somebody guilty. No. We're not even going to

make you guess as to what it was that Andre Ray and Darrell Lacy were swapping.

You know what? There's two people that know, Darrell Lacy and Andre Ray. You know, Charles Bledsoe and everybody else can come in here and tell you, 'It's consistent with what my training and experience, my work as an undercover police officer says is a crack transaction.'

Appellant argues that the prosecutor's argument constituted a comment on co-defendant Lacy's failure to testify. The court sustained Appellant's objection, denied Appellant's motion for mistrial and instructed the jury:

The Court, in connection with this matter, has instructed the jury specifically, and the Court would refer the jury to the instructions of the Court with respect to that. The Court does sustain the objection of Counsel and refers the jury to the Court's instructions of law contained in the Charge of the Court. You are to follow the Court's instructions of law very carefully, and in your deliberation process, be sure to comply completely with the Court's instructions as to the law in the case.

After reviewing the record as a whole, we do not find reversible error. Any error that occurs as a result of an improper jury argument is routinely cured by the trial court's instructions, if its instructions are clear, and unequivocal. *Kinnamon v. State,* 791 S.W.2d 84, 89 (Tex.Cr.App.1990). The court's instructions cured any error in the prosecutor's argument. Points four, five, six, and seven are overruled.

The judgment of the trial court is affirmed.