COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| PHYLLIS WOODALL, | § | No. 08-07-00015-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 171st District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC#20040D01264) |
| | § | |

**O P I N I O N**

Phyllis Woodall was indicted for one count of aggravated promotion of prostitution (Count 1) and four counts of engaging in organized criminal activity (Counts II-V). A jury found her guilty of engaging in organized criminal activity as specified in Count II of the indictment. She was sentenced to sixteen years' confinement and fined $10,000. For the reasons that follow, we reverse and remand for a new punishment hearing.

**STATEMENT OF FACTS**

Appellant and her business partner, Jeannie Coutta, owned and operated the Naked Harem, each having 50 percent ownership of the club. The Naked Harem was an adult entertainment establishment without a liquor license. Patrons brought their own alcoholic beverages and paid a cover charge to watch completely nude female dancers. For a $1 tip to the dancer per song, patrons could sit by one of the stages and watch. For $10 to $20 per song, a patron could purchase a table dance, in which the dancer was closer to and more intimate with the customer. For $130 in cash or a $140 credit card charge, a patron could purchase a private dance – lasting two songs – in one of the four private rooms. If the patron wanted more private time, he could purchase additional songs.

The fee was not contingent upon sexual contact occurring.

The dancers were not employees and were not paid a salary. They were independent contractors who paid the club $10 per day to perform. The dancers kept the money earned from their stage and table dances, but they were required to split with the club the money charged for the private dances. The dancers kept $40 per song and the club kept the balance. Any tips the dancers received while performing in the private rooms were strictly theirs.

Appellant and Coutta had total control over club operations. They were rarely on the premises, although Appellant had closed-circuit television cameras placed throughout the club – except for the private rooms – and she would monitor the dancers from her house. Her managers and dancers alerted her to problems or rumors of wrongdoing. If Appellant learned a dancer was committing acts of prostitution, the dancer was supposed to be fired.

In addition to Appellant and Coutta, the other individuals named in the indictment as part of the combination were club managers Sandra Zepeda, Jacob Crum, Maria Brooks, and Richard Hamm. The managers were not paid a salary but received a commission based on a percentage of club revenue. Generally speaking, the club generated 50 percent to 75 percent of its revenue from the private dances. In fact, it could not have survived otherwise.

*Testimony of the Employees*

Appellant and Coutta did not like the dancers to only offer table dances, as that was seen as selfish and it did not make money for the club. Thus, the managers were told to encourage the dancers to sell private dances. The "official" policy was that no sexual contact was allowed anywhere in the club, including the private rooms. There was a sign posted at the entrance stating, "Sex is not permitted or offered in this club at all - From management." But according to Jacob Crum, Appellant encouraged the dancers to engage in sexual acts with the patrons.

Crum was an employee of the club for seven years. He was aware of the sexual activity and prostitution occurring in the private rooms and estimated that ten or twenty dancers were engaging in sexual contact. Crum often had a choice of dancers to send to "high-rollers," and he would send the dancers he knew or suspected were willing to perform sexual acts. According to Crum, Appellant knew about the prostitution. He overheard Appellant tell one of the dancers that she could make a lot of money by engaging in oral sex. Appellant was also heard to comment that "the dancers shouldn't be having sex in the privates, but it was difficult or hard to control what they did back there."

Richard Hamm worked at the club for nine years in various positions including as a manager. Appellant constantly told the managers that "whatever goes on in the private is private." Hamm knew that there was prostitution occurring. Crum and Zepeda also knew, but Brooks ignored it. Zepeda's daughter Precious danced at the club and Zepeda admitted that her daughter was a prostitute. Hamm also explained that local Planned Parenthood representatives would come by the club and leave a supply of condoms and dental dams. It also provided information regarding sexually transmitted diseases. Appellant knew there were condoms available at the club.

Joel Rodriguez is another former manager. When he was hired, Appellant told him that sex was against the rules and that he was to fire any dancer caught having sex in the private room or talking about it. Yet when Rodriguez actually fired two dancers for talking about having sex in the private rooms, Appellant re-hired them. She told Rodriguez it was none of his business and that he should not interfere with the dancers.

*Testimony of the Customers*

Several former patrons testified and admitted engaging in sexual activity. Matthew Michael Lopilato said dancers offering private dances approached him. When he asked what would occur

in the private rooms, he was told that he could do anything he wanted. On several occasions, he engaged in sexual activities with dancers in the private rooms. Michael A. Soto testified that when he asked what happened in the private rooms, a dancer responded "pretty much anything" and told him that they could have sex. He and a dancer had oral and "regular" sex. David Andrade had been a customer for twenty years. He had sex with a dancer known as Brandy on thirty different occasions. He also had sexual relations with fifteen other dancers at the club. David Montalvo was also a twenty-year customer. He had sex with the dancers in the private rooms on several occasions. According to Montalvo, not all the dancers were willing to have sex, but all you had to do was ask.

Anthony Martinez began going to the club in 1996. He had sex with Zepeda's daughter, Precious, in one of the private rooms. Pedro Cintron had sex in the club on various occasions and in one instance spent in excess of $10,000 in a single night. Other patrons testified in similar fashion.

*Testimony of the Dancers*

The jury also heard from some of the dancers. Veronica de Luna had a few regular customers with whom she had sex in the private rooms. Mari Lee Snider danced for six months and had sex with a customer on one occasion. Snider recounted that Appellant told the dancers not to touch the condoms and that the customers should put them on. The condoms were not to be thrown in the trash.

Tara Pannell testified that she too had sexual contact with the customers in the private rooms. Although management encouraged dancers to do private dances, they were never told what to do once they were in the private rooms. Pannell said that Appellant had nothing to do with her committing acts of prostitution, but that Appellant knew prostitution was occurring.

Molly Crum also worked as a dancer. In spite of the no sexual-contact rule and despite the

fact that her husband worked at the club, Crum had sex in the private rooms. She testified that Appellant knew about the distribution of condoms and instructed dancers not to leave condoms in the private rooms. Other dancers admitted to engaging in sexual contact with the customers. Most said that there was no extra charge for the sex, but a few admitted that they charged the patron extra. Still others testified that they did not have sexual contact with the customers.

*Physical Evidence*

Other evidence of physical signs of prostitution was presented to the jury. Richard Hamm observed dancers emerging from private rooms with "fluids coming out between their legs, or on their breasts, or around their lips" which could be seen under the black lights. The cameras also showed that dancers would rush out of the private rooms to the bathroom or dressing room area to clean themselves with baby wipes and brush their teeth. Illegal sexual activity was also occurring on the club floor. Some dancers would allow the patrons to touch them on their breasts or genitals during the lap dances. Former patrons also described how a dancer would rub her nude breasts against them and/or allow them to touch her breast and buttocks during a table dance.

The club developed a problem with used condoms left in the private rooms. Appellant met with club employees and dancers and announced she would fine the dancers $50 for condoms left in the room. They were instructed to flush the condoms down the toilet. A special trap had to be installed in the sewer line to catch the condoms and baby wipes. Appellant acknowledged she had a plumber install the trap.

**GRAND JURY TESTIMONY**

We begin with Issues Seven and Eight. Issue Seven complains that grand jury testimony was erroneously admitted under the past recollection recorded hearsay exception. Issue Eight challenges the admissibility of grand jury testimony in violation of the Confrontation Clause.

Lucia Pinedo, a former dancer at Naked Harem, provided grand jury testimony relating to her activities there. Appellant called Pinedo as a witness at trial. She testified that she had been in a serious automobile accident a year earlier, when she was 18, and suffered memory loss as a result. She was not able to remember speaking to the grand jury, nor could she recall working at Naked Harem.

After Pinedo's first day of testimony, the prosecutor asked that she be kept under subpoena for possible re-call. After Appellant rested, the prosecutor tried to re-call Pinedo as a witness. She was not present. At that point, the prosecutor proposed reading Pinedo's grand jury testimony to the jury as a past recollection recorded under TEX.R.EVID. 803(5). The defense objected on two grounds. First, counsel argued that the State had failed to establish a proper predicate, and second, counsel argued that he would not be able to cross-examine Pinedo about the grand jury testimony, thus violating Appellant's right of confrontation. The trial court offered to issue a writ of attachment, but the defense claimed it would be futile since Pinedo had already testified she had no memory of her statements to the grand jury. In the end, the defense rejected the writ of attachment and the trial court overruled its objections.

The State read to the jury the fifty-seven pages of Pinedo's grand jury testimony, including her written statement to the police. At that time, Pinedo was 15 years old and had been a dancer at the Naked Harem for about a month. She had used her high school picture I.D. when seeking a position as a dancer. She was told that the policy of the club was that no sex or touching was permitted in the private rooms with customers. She went into private rooms with customers three or four times during each of her eight-hour shifts. She had sexual contact with customers on numerous occasions, and engaged in oral sex a few times per week. She admitted to six occasions of sexual intercourse and she explained that on her first night at work, she made $900. Pinedo was

granted immunity from prosecution for her testimony.

*Confrontation Clause*

In all state and federal criminal prosecutions, the accused has a right, guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, "to be confronted with the witnesses against him." U.S. Const. amends. VI, XIV; *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 1359, 158 L.Ed.2d 177 (2004); *Pointer v. Texas*, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965) (applying the Sixth Amendment to the states). To implicate the Confrontation Clause, an out-of-court statement must be (1) made by an absent witness and (2) testimonial in nature. *Crawford*, 541 U.S. at 50-52. Once the Confrontation Clause is implicated, testimonial hearsay is inadmissible unless (1) the declarant is shown to be unavailable to testify and (2) the defendant had a prior opportunity to cross-examine the declarant. *Id*. at 53-54. Although we defer to a trial court's determination of historical facts and credibility, we review a constitutional legal ruling *de novo*. *Wall v. State*, 184 S.W.3d 730, 742 (Tex.Crim.App. 2006).

Post-*Crawford*, the threshold question in any Confrontation Clause analysis is whether the statements at issue are testimonial or non-testimonial in nature. *Wilson v. State*, 151 S.W.3d 694, 697 (Tex.App.--Fort Worth 2004, pet. ref'd); *see Crawford*, 541 U.S. at 68-69. Testimony before a grand jury and statements derived from police interrogations are indisputably testimonial. *See Crawford*, 541 U.S. at 68.

The State argues the Confrontation Clause was not implicated because Pinedo was not absent from trial. It is true that Pinedo did appear in court and that she was questioned by defense counsel, but she testified to a complete memory loss concerning her grand jury testimony. TEX.R.EVID. 804(a)(3) (witness who testifies to lack of memory of subject matter of declarant's statement is unavailable as witness). "Absence" in the sense of implicating the Confrontation Clause does not

always mean physical absence (although we note that Pinedo was physically absent when her testimonial statements were read). *Morrison v. State*, No. 02-05-00443-CR, 2007 WL 614143, at *3-4 (Tex.App.--Fort Worth 2007, pet. ref'd) (not designated for publication) (*Crawford* analysis performed where declarant was actually present at trial for examination, but would not testify to the elements of the offense and out-of-court statements were used to supply testimony declarant was unwilling and unable to give). *See Del Carmen Hernandez v. State*, 219 S.W.3d 6 (Tex.App.--San Antonio 2006), *aff'd*, 273 S.W.3d 685 (Tex.Crim.App. 2008) (witness was not available to testify and the Confrontation Clause was implicated regarding out-of-court statements used where witness invoked Fifth Amendment right not to testify); *Laredo v. State*, 194 S.W.3d 637 (Tex.App.--Houston [14th Dist.] 2006, pet. ref'd) (where child actually testified but refused to answer any questions about alleged offense, either simply not responding to questions, stating she did not remember what happened, or stating she did not want to talk about it, child was found not available to testify under TEX.CODE CRIM.PROC.ANN. art. 38.071, § 3 and admission of child's out-of-court statements implicated the Confrontation Clause). We conclude the Confrontation Clause was implicated here because the State used out-of-court testimonial statements about which the declarant could not be cross-examined due to memory loss.

The State next argues that Pinedo's absence could have been remedied by the issuance of a writ of attachment. The trial court offered to issue the writ, but Appellant expressly rejected the offer because it would be futile. Pinedo had already testified she had suffered a complete memory loss over the relevant subject matter. She did not remember giving the grand jury statement, nor could she remember working at the Naked Harem. A writ of attachment would not have changed Pinedo from an "absent" witness into a witness "available for trial and examination." Her undisputed testimony about the car accident and resulting memory loss established that she was

unavailable as a witness regarding the relevant subject matter. Once Pinedo's unavailability was established, she remained unavailable at least so long as her memory was not restored.

Pinedo's memory loss satisfies the first prong of *Crawford*. As for the second prong, Appellant never had – and would not have had – an opportunity to cross-examine Pinedo regarding her grand jury testimony. Regardless of whether Pinedo was returned to court, she could not have been questioned about her prior testimonial statements. We thus conclude that admission of the grand jury testimony was constitutional error.

*Harm Analysis*

*Crawford* error is constitutional error subject to a harm analysis under TEX.R.APP.P. 44.2(a). *McNac v. State*, 215 S.W.3d 420, 421 (Tex.Crim.App. 2007). We must reverse Appellant's conviction unless we find beyond a reasonable doubt that the error did not contribute to conviction or punishment. *Wall*, 184 S.W.3d at 745-46. The Court of Criminal Appeals has established four factors we should consider in analyzing harm from *Crawford* error: (1) the importance of the hearsay statements to the State's case; (2) whether the hearsay evidence was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; (4) the overall strength of the State's case. *Davis v. State*, 203 S.W.3d 845, 852 (Tex.Crim.App. 2006), *cert. denied*, 549 U.S. 1344, 127 S.Ct. 2037 (2007). We must be convinced beyond a reasonable doubt that the error probably did not have a significant impact on the mind of the average juror. *Id*. We apply a harm analysis to both the guilt/innocence stage and the punishment stage of trial. *See Wall*, 184 S.W.3d at 746-47.

We conclude beyond a reasonable doubt that the grand jury testimony did not contribute to the conviction. We agree with the State that Pinedo's grand jury testimony was cumulative of the many former dancers who testified to the same end. We are satisfied that the evidence was legally

sufficient to support a conviction even without Pinedo's testimony, as the evidence of guilt was overwhelming. But the same cannot be said of the punishment phase. We agree with Appellant that the details of alleged acts of child prostitution contained in the fifty-seven page grand jury testimony were explosive and likely had a significant impact on the minds of the jurors. No other child witness testified at trial, and the State sought a harsher punishment because the Appellant never apologized for allowing child prostitution to occur. We highlight here portions of the State's closing argument:

> Same thing with the under-age dancer. You saw that little girl when she came in and testified. You know what she looked like. And this is three years after she was hired by the defendant to work in her club. The extent of her responsibility, as you can judge from the evidence, "Oh, well, I asked her what her age was. She said she was 18, so I've got no further responsibility to check and actually find out how hold [sic] she is." I mean, she looks like she's 12. But, "Oh, well, I asked her and she showed me a high school ID" – that had no date of birth or anything else on it. But, "I've got no further responsibility to find out whether she actually was of legal age to work in my club. I didn't have to ask her for her driver's license. I didn't have to ask her for her birth certificate. I was just going to take her word for it." Even though any reasonable person is going to say, "Hey, girl, you're way underage. There's no way you're going to work in my club."

> But she hires her to work in here [sic] club. Within days she's engaging in prostitution activity in that club. Why? It's a fresh dancer. It's a new face. It makes more money for her and makes more money for her manager to exploit her.

Appellant was eligible for probation. She was sentenced to sixteen years' imprisonment. We conclude that the trial court erred by allowing Pinedo's out-of-court statements to be read to the jury in violation of Appellant's rights under the Sixth and Fourteenth Amendments, and that the error caused harm in the punishment stage of the trial. We sustain Issue Eight. Because we have found the grand jury testimony was erroneously admitted in violation of the Confrontation Clause, we need not address Appellant's argument in Issue Seven that it was improperly admitted pursuant to a hearsay exception.

Our resolution of the grand jury testimony requires a remand only for purposes of

punishment. Because Appellant raises other issues relating to error at the guilt/innocence phase, we must address them in full.

## COUNSEL OF CHOICE

Michael Gibson represented Appellant at trial. Sandra Zepeda, named along with Appellant in the indictment, was represented by Charles Roberts. Appellant informed the trial court that she wanted Roberts to conduct voir dire because of his expertise in jury selection. The prosecutor objected because he intended to subpoena Zepeda and conflicts of interest would exist. The prosecutor also advised that Zepeda would receive immunity for her testimony in Appellant's case. Both Appellant and Zepeda signed waivers of any conflict of interest. Gibson intended to resume his role as lead counsel after the jury was empaneled. The trial court would not allow Roberts to conduct the voir dire. Nevertheless, he assisted Gibson during voir dire by taking notes and offering his opinion as to which members of the venire panel should be stricken.

Appellant now complains that her Sixth Amendment right to the counsel of her choice has been violated. The Sixth Amendment has been interpreted to guarantee a criminal defendant his choice of counsel as long as the attorney is qualified and the defendant can afford her choice or counsel will represent the defendant regardless of the defendant's ability to pay. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S.Ct. 2557, 2561, 165 L.Ed.2d 409 (2006); *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989). This right is not absolute and "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 1697, 100 L.Ed.2d 140 (1988). When dealing with conflicts of interest, a trial court may refuse to allow the representation by an attorney in conflict and the judge is given wide latitude in denying a waiver of conflict by the parties. *Wheat*, 486 U.S. at 163, 108 S.Ct. at 1699. So, "while there is a strong presumption in favor of a

defendant's right to retain counsel of choice, this presumption may be overridden by other important considerations relating to the integrity of the judicial process and the fair and orderly administration of justice." *Gonzalez v. State*, 117 S.W.3d 831, 837 (Tex.Crim.App. 2003) (citing *Wheat*, 486 U.S. at 158-60). If the trial court acts unreasonably or arbitrarily in denying a defendant's right to choose counsel, it rises to the level of a constitutional violation. *Id*. And as we now know, an erroneous deprivation of a defendant's right to choose the counsel of her choice qualifies as structural error which is not subject to harm analysis because it is impossible to quantify the type of harm or its impact on the overall case. *Gonzalez-Lopez*, 548 U.S. at 141, 126 S.Ct. at 2559.

We have reviewed the record to determine if the trial court was justified in finding that a conflict of interest did exist, or that a showing for a potential conflict was made. Zepeda was a co-defendant who would be subpoenaed to testify against Appellant. She would also receive immunity for her testimony. The trial court has an independent duty to ensure that a fair and legitimate trial is conducted and in seeing that its judgments remain intact on appeal. *Wheat*, 486 U.S. at 161-62, 108 S.Ct. at 1697-98. The record contains evidence that a conflict of interest was present. The trial court is given latitude in refusing to accept a waiver to ensure that a fair trial is conducted. *Id*. at 162-63. We overrule Issue One.

**VOIR DIRE**

In her second and third issues, Appellant complains she was denied the right to ask questions regarding the presumption of innocence and questions regarding bias and prejudice. Article I, § 10, of the Texas Constitution guarantees the right to counsel. This includes the right of counsel to question members of the venire panel in order to intelligently exercise peremptory challenges. *Howard v. State*, 941 S.W.2d 102, 108 (Tex.Crim.App. 1996); *Ex parte McKay*, 819 S.W.2d 478, 482 (Tex.Crim.App. 1990); *Shipley v. State*, 790 S.W.2d 604, 607-08 (Tex.Crim.App. 1990). When

an appellant challenges a trial judge's limitation on the voir dire process, the reviewing court must analyze the claim under an abuse of discretion standard, the focus of which is whether the appellant proffered a proper question concerning a proper area of inquiry. *Howard*, 941 S.W.2d at108; *Caldwell v. State*, 818 S.W.2d 790, 793 (Tex.Crim.App. 1991), *cert. denied*, 503 U.S. 990, 112 S.Ct. 1684 (1992), *overruled on other grounds by Castillo v. State*, 913 S.W.2d 529 (Tex.Crim.App. 1995); *Cockrum v. State*, 758 S.W.2d 577, 584 (Tex.Crim.App. 1988), *cert. denied*, 489 U.S. 1072, 109 S.Ct. 1358 (1989). A proper question is one which seeks to discover a venire member's views on an issue applicable to the case. *Howard*, 941 S.W.2d at108; *Caldwell*, 818 S.W.2d at 794; *Guerra v. State*, 771 S.W.2d 453, 468 (Tex.Crim.App. 1988). If a proper question is disallowed, harm to the appellant is presumed because she has been denied the ability to intelligently exercise her peremptory strikes. *Howard*, 941 S.W.2d at108; *Caldwell*, 818 S.W.2d at 793. However, a trial court is given broad discretionary authority to impose reasonable restrictions on the voir dire process. *Howard*, 941 S.W.2d at108; *Caldwell*, 818 S.W.2d at 794. In particular, a trial court may restrict confusing or misleading voir dire questions. *See Jones v. State*, 850 S.W.2d 223 (Tex.App.--Fort Worth 1993, pet. ref'd). Where the trial court places no absolute limitation on the underlying substance of a voir dire question, it is incumbent upon defense counsel to rephrase an improperly phrased query or else waive the voir dire restriction. *Howard*, 941 S.W.2d at 108-11.

*Presumption of Innocence*

Before the commencement of voir dire, defense counsel asked the trial court if he could pursue questions based on his definition of the presumption of innocence. He argued that the presumption of innocence requires jury members to maintain that presumption until they begin deliberations. The trial court replied that the presumption of innocence applies only until the beginning of trial. During voir dire the prosecutor explained that the State caries the burden of

proving all elements of the crime beyond a reasonable doubt. Defense counsel also explained the different burdens of proof, reiterating that all allegations had to be proven beyond a reasonable doubt.

We agree with Appellant that the presumption of innocence continues throughout the trial and until the jury reaches a verdict based on the facts presented at trial. *Miles v. State,* 204 S.W.3d 822, 824 (Tex.Crim.App. 2006); *McGrew v. State*, 140 Tex.Crim. 77, 78, 143 S.W.2d 946, 946-47 (1940); *Massey v. State*, 154 Tex.Crim. 263, 226 S.W.2d 856, 860 (1950). This does not mean, however, that a juror is not continuously weighing the strength of the evidence and making inferences during the presentation of both sides' cases. In practice, the presumption of innocence is merely an assignment of a burden of proof, and it serves as a constant reminder that the jury is to consider nothing but the evidence in determining guilt or innocence. *Madrid v. State*, 595 S.W.2d 106, 110 (Tex.Crim.App. 1979); *Rideau v. State*, 751 S.W.2d 248, 250 (Tex.App.--Beaumont 1988, no pet.). The trial court may prohibit questions that could be misleading. The court could have reasonably concluded that the jury might think they were not permitted to form any opinions whatsoever during the course of the trial. In no way did the court prevent defense counsel from asking other questions about the presumption of innocence. We overrule Issue Two.

### *Jurors' Neighborhoods*

During voir dire, defense counsel asked whether any venire member had religious issues with adult entertainment establishments or whether they would object to a strip club operating in their own neighborhood. The State objected on relevancy grounds. Defense counsel replied that he wanted to know if a juror "would go absolutely bonkers if they tried to put an adult club up against – up in my block." The following exchange then occurred:

COURT:     What does this have to do with this case in being fair and impartial in

trying this case?

DEFENSE:    What is has to do with is because they have a bias or prejudice–

COURT:      No, sir.  No, sir.

DEFENSE:    – against an adult club.

COURT:      No, sir, that's not it.  Ask them that question: "Do they have a bias and a prejudice?"

. . .

COURT:      Can they be fair.  And you're not getting there.  And you're inviting, again, remarks that are going to be highly moot, highly emotional, highly charged, and I'm not going to allow it anymore.  Because that's what is going to happen.  I think you're inviting errors is what you're doing, with your conduct and your questions.  And you know that.  You know that.

DEFENSE:    All right, let me get this clear.  The Court is not going to allow me to examine the individual voir dire persons on the venire by asking them – other than saying, "Do you have a bias against adult clubs," other than asking that question?  I can't ask them any other questions about that?  About how they feel about it or whether they would like to have one next door to them?  Or why they think they're bad?

COURT:      How they feel about it is one thing –

DEFENSE:    That's what I asked them.

COURT:      No.  You're asking them whether or not they want – they would be happy about having a – this kind of club next to their house or in their neighborhood.

. . .

DEFENSE:    You keep forgetting the purpose of this is to allow me to exercise my peremptory challenges intelligently.  And if a juror says, "I hate these places, and I don't like them, and I set fire to it or burn them down if they open up next to me," that allows me to exercise an intelligent peremptory.  Simply saying to somebody, "You got any bias or prejudice?"  "No."  That doesn't even get close to it, Judge.

COURT:      You can ask them that question, but don't ask them how they feel

about having this kind of establishment in their neighborhood . . . .

.   .   .

COURT:    So however you want to ask those questions, I will allow you.  Not in regards to having an establishment like this where they live.  I'm not going to allow that question.

DEFENSE:    Okay.

COURT:    Go ahead.

DEFENSE:    Well, I can't.

Only one panel member had moral objections to strip clubs.  Defense counsel moved for a mistrial on the grounds that he had been prevented from questioning venire members about moral and religious objections to strip clubs.  At this point the trial court emphasized that the only prohibited line of questioning was whether the panel members would want an adult entertainment establishment in their neighborhood.

Trial courts are given broad discretionary authority to impose reasonable restrictions on the voir dire process.  *Howard*, 941 S.W.2d at 108; *Caldwell*, 818 S.W.2d at 793.  Counsel was permitted to ask what bias or prejudice panel members had about adult entertainment clubs.  Because the trial court was entirely within its discretion in limiting the defense to relevant questioning, Appellant was not denied her right to intelligently exercise her peremptory strikes.  We overrule Issue Three.

## DENIAL OF MISTRIAL

During voir dire, the prosecutor sought to determine whether any of the prospective jurors had heard pretrial publicity concerning the Naked Harem. He also asked whether anyone had personal experience with the club, and, if so, would they be able to base their decision on the evidence presented at trial.  In response to that question, a prospective juror called the Naked Harem a whorehouse and announced that her husband had been there.  The prosecutor tried to quiet the

juror, but she again called the club a whorehouse.

Defense counsel immediately approached the bench and asked the trial court to instruct the panel to disregard the outburst. The court complied with this request. Counsel then moved for a mistrial, which was denied. The trial court instructed the prospective juror to stand and told the panel to disregard her outburst. The panel was also directed to be quiet and obedient if an attorney so instructed them. The prosecutor then asked the remaining panel members whether they could decide the case on the basis of the evidence presented at trial and explained that the outburst was not evidence. He then polled the panel members row by row on whether they could follow the court's instruction to disregard the outburst. Only Juror Number 115 could not follow the instruction. Neither the outspoken juror nor Juror Number 115 were seated on the jury.

Appellant argues that the trial court abused its discretion by denying her motion for mistrial. She claims the outburst went to the heart of the State's case and was clothed in emotional assertions of marital infidelity. A mistrial is appropriate for "highly prejudicial and incurable errors." *Simpson v. State*, 119 S.W.3d 262, 272 (Tex.Crim.App. 2003). We review the denial of a motion for mistrial under an abuse of discretion standard. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex.Crim.App. 2004). When reviewing the ruling, we look to: (1) the severity of the misconduct (the magnitude of the prejudicial effect); (2) the measures adopted to cure the misconduct (the effectiveness of any cautionary instruction by the judge); and (3) the certainty of conviction absent the misconduct. *Id*. "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Id.*

We are to presume that the trial court's well-worded instruction cured any prejudicial effect the comment otherwise would have had. *See Wesbrook v. State*, 29 S.W.3d 103, 116 (Tex.Crim.App. 2000) (we presume the trial court's instruction to disregard was followed by jurors); *Williams v. State*, 937 S.W.2d 479, 490 (Tex.Crim.App. 1996); *Waldo v. State*, 746 S.W.2d 750-54

(Tex.Crim.App. 1988); *see also Wilkerson v. State*, 881 S.W.2d 321, 327 (Tex.Crim.App.1994), *cert. denied*, 513 U.S. 1060, 115 S.Ct. 671, 130 L.Ed.2d 604 (1994) (an instruction to disregard will generally cure the error).

While the outburst here was prejudicial and harmful, even harmful comments can be cured by an instruction. *Young v. State*, 137 S.W.3d 65, 71 (Tex.Crim.App. 2004). Sufficient measures were taken here to cure the harm. The panel was instructed to disregard the outburst and to listen to the attorneys. When polled, only one panel member was unable to set aside the outburst and render a decision solely on the basis of evidence presented at trial. We overrule Issue Four.

### ACCOMPLICE WITNESS TESTIMONY

A conviction may not be had upon the testimony of an accomplice unless that testimony is corroborated by other non-accomplice evidence that tends to connect the defendant to the crime. TEX.CODE CRIM.PROC.ANN. art. 38.14 (Vernon 2005). "An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state." *Druery v. State*, 225 S.W.3d 491, 498 (Tex.Crim.App.), *cert denied*, ___U.S.___, 128 S.Ct. 627 (2007). This participation must include an affirmative act in promotion of the commission of the offense with which the defendant is charged. *Id*. at 498.

To be an accomplice as a matter of law, the participant must be susceptible to prosecution for the offense with which the defendant is charged or a lesser-included offense. *Id*. If the individual has been charged with the offense or a lesser-included offense, the jury should be instructed that the witness is an accomplice as a matter of law. *Id*. An immunity agreement is directly relevant to determining whether a witness is an accomplice as a matter of law. *Jones v. State*, 195 S.W.3d 279, 290 n.12 (Tex.App.--Fort Worth 2006), *aff'd*, 235 S.W.3d 783 (Tex.Crim.App. 2007). If there is conflicting evidence, the trial court should submit an accomplice-as-matter-of-fact instruction in the

charge. *Druery*, 225 S.W.3d at 498-99. And as the State points out, there must be some evidence of an affirmative act by the witness to assist in the commission of the charged offense before such an instruction is required. *Id.* at 499.

When reviewing the sufficiency of corroborating evidence under Texas Code of Criminal Procedure Article 38.14, we must eliminate from consideration any testimony by an accomplice witness. *Bingham v. State*, 913 S.W.2d 208, 210 (Tex.Crim.App. 1995). This does not mean the non-accomplice evidence has to prove guilt beyond a reasonable doubt, but it must connect the defendant with the offense. *McDuff v. State*, 939 S.W.2d 607, 612 (Tex.Crim.App. 1997). All that is required for corroboration is some non-accomplice evidence tending to connect the defendant with the offense. *Joubert v. State*, 235 S.W.3d 729, 731 (Tex.Crim.App. 2007).

The State and the defense agree that Richard Hamm and Jacob Crum were accomplices as a matter of law. All of the patrons and dancers were granted transactional immunity, and the State agrees that these witnesses were susceptible to prosecution for prostitution, which is a lesser-included offense of the charged offense of engaging in aggravated promotion of prostitution. The State concedes that the patrons and dancers were accomplices as a matter of law, but argues that Appellant failed to request a jury instruction. As a result, the witnesses' accomplice status was a fact question for the jury.

Appellant testified at trial. She acknowledged that she had total control over the hiring and firing of all employees, managers, and dancers. She was aware of the problems at the club and kept an ear to the wall. She had installed cameras throughout the club so that she could monitor activities from her home. She knew that Planned Parenthood delivered condoms and oral dams to the club. She knew that condoms were being left in the private rooms, and she instructed the dancers to clean up the rooms. She hired a plumber to install a trap in the sewer line because dancers were flushing

baby wipes down the toilet. A photograph of the trap was admitted into evidence showing large amounts of used condoms. Appellant was aware that inappropriate sexual activity had been occurring. She even knew that Crum was being paid to have sex with one of the dancers while a customer watched. Sufficient non-accomplice evidence connects Appellant with aggravated promotion of prostitution.

The record also contains the non-accomplice testimony of Joel Rodriguez, a former manager. Rodriguez testified that Appellant re-hired two dancers he had fired for having sex in the club. Appellant told him it was none of his business and that she watched what the girls were doing in the private rooms. Rodriguez also testified that Appellant and Coutta told the managers what to do and how to run the club.

Sufficient non-accomplice evidence tends to connect Appellant to the charged and predicate offenses. The non-accomplice evidence must only tend to show that Appellant was involved in the aggravated promotion of prostitution and a criminal combination. We overrule Issue Five.

## ORGANIZED CRIMINAL ACTIVITY

Having concluded that the Appellant was sufficiently connected to the charged offense, we turn now to whether the evidence was legally sufficient to support the conviction for organized criminal activity. A legal sufficiency review is conducted under the *Jackson v. Virginia* framework. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We review the evidence in the light most favorable to the verdict and reverse only if no rational trier of fact could have found that the State discharged its burden of proof beyond a reasonable doubt. *Id*.

The State proceeded to trial on Count II of the indictment, which alleged that Appellant "did then and there with intent to establish, maintain, and participate in a combination and in the profits of a combination with **JEANNIE COUTTA, SANDRA ZEPEDA, JACOB CRUM, MARIA**

**BROOKS, AND RICHARD HAMM**, did then and there commit the criminal offense of **Aggravated Promotion of Prostitution** . . . .”  A “combination” is defined as “three or more persons who collaborate in carrying on criminal activities.”  TEX.PENAL CODE ANN. § 71.01(a) (Vernon 2003).  The aggravated promotion of prostitution is a predicate offense to a combination.  TEX.PENAL CODE ANN. § 71.01(a)(3).  The State must prove a two-part *mens rea*.  *Hart v. State*, 89 S.W.3d 61, 63 (Tex.Crim.App. 2002).  First, the State must prove the defendant has the requisite culpable mental state to commit the predicate offense; and second, the State must prove that the defendant committed the predicate offense with the intent to establish, maintain, or participate in a combination or the profits of a combination.  *Id*.  The State must also prove that the members of the combination intended to work together in a continuing course of criminal activity, *Dowdle v. State*, 11 S.W.3d 233, 236 (Tex.Crim.App. 2000); *Barber v. State*, 764 S.W.2d 232, 235 (Tex.Crim.App. 1988).

Under Texas law a person commits prostitution if she engages in sexual conduct for a fee.  TEX.PENAL CODE ANN. § 43.02(a)(1) (Vernon 2003).  “Sexual conduct” includes oral sex, sexual intercourse, and “sexual contact,” which is defined as any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person.  TEX.PENAL CODE ANN. § 43.01.  A person commits the offense of aggravated promotion of prostitution if she knowingly owns, invests in, finances, controls, supervises, or manages a prostitution enterprise that uses two or more prostitutes.  TEX.PENAL CODE ANN. § 43.04(a).  A “prostitution enterprise” has been defined in this context as “a plan or design for a venture or undertaking in which two or more persons offer to, agree to, or engage in sexual conduct in return for a fee . . . .”  *Taylor v. State*, 548 S.W.2d 723, 723 (Tex.Crim.App. 1977).

Appellant concedes the evidence reflects she was aware sexual contact occurred between

dancers and customers at the Naked Harem. But she claims that awareness of these unlawful activities did not prove her intent to engage in the offense of aggravated promotion of prostitution. She also argues that no agreement to engage in organized criminal activity among the combination members was shown.

A jury is permitted to use circumstantial evidence in arriving at a determination of intent and knowledge. *Munoz v. State*, 29 S.W.3d 205, 209 (Tex.App.--Amarillo 2000, no pet.). A jury may infer from circumstantial evidence (1) the defendant's knowledge of the prostitution activity occurring in her place of business; (2) the defendant's intent to participate in a combination; and (3) the agreement of the combination members to work together in carrying out criminal activities. *Hart*, 89 S.W.3d at 63-64.

Both Crum and Hamm testified that Appellant knew about the prostitution and encouraged it, at least privately. Dancer Molly Crum testified that Appellant told her that she could allow the customers to touch her sexually in the private rooms. This type of acquiescence or tacit promotion is sufficient evidence from which a jury may infer that Appellant was in the business of promoting prostitution. *Armentrout v. State*, 645 S.W.2d 298, 299-302 (Tex.Crim.App. 1983); *Ringer v. State*, 577 S.W.2d 711, 713-16 (Tex.Crim.App. 1979). Viewing the evidence in a light most favorable to the verdict, it was reasonable for the jury to have found beyond a reasonable doubt that Appellant was engaged in a combination. We overrule Issue Six.

### CHARGE ERROR

*Accomplice as a Matter of Fact*

Appellant first complains that the trial court erred by not including in the charge an instruction on accomplices-as-a-matter-of-fact. The record indicates that the accomplice-witness instruction was included in the charge without objection. Because Appellant acquiesced to the

charge at the formal charge conference, she has waived error. *Quattrocchi v. State*, 173 S.W.3d 120, 125 (Tex.App.--Fort Worth 2005, pet. ref'd). We overrule Issue Nine.

*The Law of Parties*

The court applied the law of the parties in the application paragraph of the charge as follows:

> Now if you find from the evidenced beyond a reasonable doubt that from on or about the 10th day of March, 2001 until on or about the 31st day of December, 2003 the Defendant **PHYLLIS WOODALL**, did then and there with intent to establish, maintain, and participate in a combination and in the profits of a combination with **JEANNIE COUTTA, SANDRA ZEPEDA, JACOB CRUM, MARIA BROOKS, AND RICHARD HAMM**, in their individual capacity or as a party, as that term has heretofore been defined for you, did then and there commit the criminal offense of **Aggravated Promotion of Prostitution**, you will find the Defendant **PHYLLIS WOODALL**, guilty of **Engaging in Organized Criminal Activity** as charged in the Indictment (Verdict Form A).

Appellant claims that this submission dispensed with the need to find collaborative criminal activity and thus allowed the jury to convict her without finding that a combination existed (acting together to commit aggravated promotion of prostitution).

The offense of aggravated promotion of prostitution and the actual combination are exclusive inasmuch as the combination members can be found guilty of the target offense if they actually committed the target offense or if the defendant committed personally one of the two overt acts required by TEX.PENAL CODE ANN. § 71.01(b) (Vernon 2003). *McIntosh v. State*, 52 S.W.3d 196, 200 (Tex.Crim.App. 2001). A conspirator is punished because of the agreement to commit an offense with no requirement that the object offense actually be committed. *Cf. Woods v. State*, 801 S.W.2d 932, 943 (Tex.App.--Austin 1990, pet. ref'd) (explaining that the purpose of prohibiting conspiracies is to prevent "socially dangerous combinations"). A party is criminally responsible for the offense committed by another because of the party's own solicitation, encouragement, aid, or direction. The party is responsible for the conduct of another because of his level of participation

in the offense. TEX.PENAL CODE ANN. § 7.02 (Vernon 2003). In a conspiracy, the object offense need not be committed, but the conspirators are still criminally liable for the agreement to commit the offense. That is why in both contexts party liability will be punished more harshly than liability as a conspirator; the party is liable for the conduct of the principal. Therefore, no inconsistency exists in requiring that the accused personally commit an overt act to support conviction of engaging in organized criminal activity by conspiring to commit the object offense and in using party liability to support a conviction under the same statute for the commission of the object offense. Because we find no error in the submission, we overrule Issue Ten.

## CONCLUSION

We affirm the judgment of conviction. We reverse and remand for a new trial on the issue of punishment.


                                        ANN CRAWFORD McCLURE, Justice
September 9, 2009

Before McClure, J., Barajas, C.J. (Ret.)., and Hill, C.J. (Ret.)
Barajas, C.J. (Ret.) and Hill, C.J. (Ret.), sitting by assignment

(Do Not Publish)